Peter C. BROWNING,
et al., Petitioners,

v.

Jeff P. PROSTOK, et al., Respondents.

No. 03–0784.

Supreme Court of Texas.

Argued Oct. 19, 2004.

Decided May 27, 2005.

---

Boe W. Martin, Dawn Ryan Budner, Sherri Turner Alexander, Rebecca Ann Hicks, Kirk Dailey Dreyer, Bell Nunnally & Martin LLP, Bruce W. Akerly, Bell, Nunnally & Martin L.L.P., Maria Katina

Karos, Bell Nunnally & Martin Pllc, Samara L. Kline, Baker Botts L.L.P., Bryant C. Boren Jr., Baker & Botts L.L.P., Dallas, Joe R. Greenhill, Bob Shannon, Baker Botts LLP, Austin, for for petitioners.

Roger Townsend, Jennifer R. Tillison, Alexander Dubose Jones & Townsend, LLP, James R. Moriarty, Patrick Kevin Leyendecker, Moriarty & Leyendecker, Richard Frankel, Stephen M. Hackerman, Hackerman Frankel, Houston, J. Robert Arnett II, Sopuch, Arnett, Higgins & Gaubert, L.L.P., Patrick J. Neligan Jr., Neligan Tarpley Andrews & Foley, L.L.P., Dallas, Craig Howard Averch, White & Case LLP, Los Angeles, CA, William Powers Jr., Austin, for respondents.

Michael P. Lynn, Russell James DePalma, Lynn Tillotson & Pinker, LLP, Basheer Youssef Ghorayeb, Rodriguez Law Firm, P.C., Dallas, Susanna J. Gray, Fried Frank Harris Shriver & Jacobson, New York, NY, for TCW Asset Management Company, TCW Group Inc., TCW Special Credits, Trust Company of the West

Thomas M. Fulkerson, Clements O'Neill Pierce Wilson & Fulkerson, Houston, for NGC Asbestos Disease and Property Damage Trust.

C. Rodney Acker, Ellen Bush Sessions, Jenkens & Gilchrist, P.C., Dallas, for Donaldson, Lufkin & Jenrette Securites Corp.

Kathy D. Patrick, Andrew L. Pickens, Jeffry Joe Cotner, Jeffrey C. Kubin, Gibbs & Bruns, L.L.P., Houston, for Fidelity Management & Research Company.

William D. Sims Jr., Michael Lawrence Raiff, Vinson & Elkins, L.L.P., Dallas, for Water Street Corporation Recovery Fund I, L.P.

Marvin S. Sloman, James A. Ellis Jr., Stephen A. Goodwin, Carrington Coleman Sloman & Blumenthal, L.L.P., Dallas, Sheldon Raab, Barry Sher, John Dellaportas, Fried Frank Harris Shriver & Jacobson, New York, NY, for Houlihan Lokey Howard & Zukin Capital.

Justice WAINWRIGHT delivered the opinion of the Court.

This dispute arises out of highly contentious bankruptcy proceedings. During the bankruptcy proceedings, a committee representing bond and trade unsecured creditors vigorously disputed the valuation of the debtor as presented by the debtor's management. The committee sought to replace the debtor's management with a bankruptcy trustee, based in part on allegations of intentional undervaluation of the debtor. In addition, the committee objected to the debtor's plan of reorganization, again raising allegations of intentional undervaluation. Over two years after the bankruptcy court entered its order confirming the reorganization plan proposed by the debtor, a class of bondholders brought this suit. The class of bondholders alleges that the officers and directors breached their fiduciary duties by intentionally undervaluing the debtor during the bankruptcy proceedings. The trial court granted summary judgment against the class and entered a take-nothing judgment. We consider whether the class claims, based on conduct occurring during bankruptcy proceedings, can be maintained in state court years after the bankruptcy court's final order confirming the debtor's reorganization plan. We conclude that the claims cannot.

## I. Background and Procedural History

### A. Bankruptcy Proceedings

On October 28, 1990, National Gypsum Company and its parent holding company, Aancor Holdings (collectively National Gypsum), filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. The United States

Bankruptcy Court for the Northern District of Texas, Dallas Division, consolidated and jointly administered the cases.

National Gypsum had three classes of publicly traded debt: 1) senior notes, 2) senior debentures, and 3) junior bonds. The senior notes and senior debentures were held by several entities known collectively as the Senior Bondholders. The junior bonds were held by persons and entities referred to as Junior Bondholders, and include Jeff Prostok and the class members he represents. In addition, there were parties holding actual or potential claims against National Gypsum arising from personal injury and property damage related to asbestos products, the Asbestos Claimants. This case stems from conflicts that arose during the bankruptcy proceedings between the Junior Bondholders and Asbestos Claimants, on one side, and the Senior Bondholders and National Gypsum management, on the other.

During the bankruptcy proceedings, National Gypsum operated as debtor-in-possession under the Bankruptcy Code.[1] In November 1990, the United States trustee appointed a committee of bond and trade unsecured creditors (the BT Committee) to serve as a statutory creditors' committee in the Chapter 11 proceedings.[2] Section 1104 of the Bankruptcy Code authorizes the bankruptcy court to replace a debtor-in-possession with an appointed trustee upon a determination that it would be in the best interest of the debtor's stakeholders or upon a determination of "cause, including fraud, dishonesty, incompetence, or gross management." 11 U.S.C. § 1104(a).[3] In January 1992, the BT Committee moved to replace National Gypsum's management with a bankruptcy trustee for the National Gypsum estate. The BT Committee claimed, among other things, that National Gypsum management had intentionally undervalued National Gypsum by "understat[ing] all its forecasts to hide its objective views of the company." After a two-day hearing on the motion in March 1992, the bankruptcy court held that the BT Committee did not meet its burden on this issue and denied the BT Committee's motion.

National Gypsum submitted a plan of reorganization to the bankruptcy court based on a $350 million valuation of National Gypsum. As part of National Gypsum's proposed plan, a second corporate entity, a new National Gypsum Company (New NGC), would receive National Gyp-

1. In Chapter 11 bankruptcy proceedings, the bankruptcy court, upon a showing of cause, will appoint a trustee to manage the estate of the debtor. 11 U.S.C. § 1104. If a trustee is not appointed, the debtor will continue to operate the business as the debtor-in-possession during the bankruptcy proceedings. *Id.* § 1108. The debtor-in-possession assumes most of the powers and duties of the trustee. *Id.* § 1107(a).

2. At the same time, the trustee created the official asbestos claimants' committee, comprised of attorneys representing asbestos-related personal injury and property damage claimants in the bankruptcy proceedings.

3. Section 1104(a) provides:
   At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

sum's operating assets and ongoing business. The plan provided that the officers and directors of National Gypsum would remain as the initial management of New NGC. New NGC stock would be largely owned by the Senior Bondholders, with Junior Bondholders receiving warrants to acquire New NGC stock.

However, the BT Committee was not satisfied with the plan and proposed a competing plan based on a $630 million valuation of National Gypsum. In November 1992, the BT Committee filed its objections to National Gypsum's plan of reorganization. The BT Committee alleged that National Gypsum's "[m]anagement knowingly misrepresented [National Gypsum's] future business prospects and value." The BT Committee explained that:

> [i]n exchange for greater than 100% recovery and control of the reorganized company's board of directors, certain post petition acquirors of Senior Notes ... publicly accepted the [National Gypsum] Plan, including its management-entrenchment and enrichment provisions. Hence, management deceived [National Gypsum's] creditors with a misrepresentation of the value of the company to coax a small creditor faction into supporting its plan and opposing the BT Plan.

Confirmation proceedings on the competing plans of reorganization began in December 1992. At the conclusion of the valuation phase of the proceedings, the bankruptcy court concluded that the BT Committee plan could not be confirmed because it failed to prove the value of National Gypsum as of the effective date of the plan of reorganization. The order confirming the National Gypsum reorgani-

zation plan was entered on March 9, 1993 and was effective as of July 1, 1993.

An interested party may contest a bankruptcy confirmation order within 180 days after its entry on the basis that it was procured by fraud. 11 U.S.C. § 1144. The 180–day period expired on September 9, 1993. No interested party requested that the order be set aside within the 180–day period or otherwise appealed the confirmation order. In October 1993, New NGC announced a new cost-savings plan that allegedly resulted in an annual reduction of expenses of $30 to $40 million dollars.

## B. Current Litigation

Prostok, individually and on behalf of all other Junior Bondholders, filed the current case in state court in October 1995 against the former officers and directors of National Gypsum (Officers and Directors) and their financial advisor, Donaldson, Lufkin & Jenrette Securities Corporation (DLJ).[4] Prostok amended his petition to add one of the Senior Bondholders, TCW.[5] Prostok sued for breach of fiduciary duties, fraud and constructive fraud, and civil conspiracy against all the defendants. Prostok also brought claims against DLJ and the Officers and Directors for gross negligence, and alternative claims against TCW and DLJ for participating, aiding, assisting, and/or inducing breach of fiduciary duties.

Prostok alleges that during the course of the bankruptcy proceedings, the Senior Bondholders, the Officers and Directors, and their financial advisors intentionally undervalued National Gypsum by concealing a plan to dramatically reduce the com-

---

4. Jackie Field Jr. and Alfred Earnest were later added as additional class representatives. We refer to Prostok, Field, and Earnest collectively as Prostok.

5. The group referred to as TCW consists of TCW Special Credits, The TCW Group, Inc., Trust Company of the West, and TCW Asset Management Company.

pany's operating expenses. Specifically, Prostok alleges that the Officers and Directors represented that National Gypsum was worth $300 to $375 million, based on management's "best estimate and intention of how the company would operate once out of bankruptcy," though the Officers and Directors were fully aware of the cost-savings plan later announced in October 1993. Prostok alleges that this cost-savings plan resulted in an increase in the market value of New NGC's outstanding stock from $350 million to almost $1 billion. According to Prostok, had the Officers and Directors disclosed the plan to cut expenses to the bankruptcy court, the value assigned to National Gypsum would have been higher, and the distribution to the Junior Bondholders would have been greater. Prostok claims that as a result of the cost-savings plan, the value in stock acquired by Senior Bondholders by reorganization far exceeded its initial value, resulting in a windfall for Senior Bondholders. Prostok alleges that in exchange for their participation in concealing the cost-savings plan, the Officers and Directors maintained their positions in New NGC and received lucrative incentive deals.

On November 15, 1995, the Officers and Directors and DLJ (the only defendants at the time) removed the case to federal district court. The bankruptcy court remanded the case to state court for lack of federal jurisdiction. The federal district court affirmed the remand order.

On March 30, 1998, New NGC intervened in the action. New NGC asserted that under the terms of the reorganization plan, it owned the claims asserted by Prostok, and thus Prostok's class lacked standing to raise the claims. New NGC sought a declaratory judgment to that effect.[6]

On February 1, 1999, the Officers and Directors, DLJ, New NGC, and TCW (except The TCW Group, Inc.) joined in a motion for summary judgment asserting that Texas law did not recognize Prostok's claims.[7] TCW (except The TCW Group, Inc.) filed a separate supplemental motion for summary judgment against Prostok, asserting statute of limitations, res judicata, collateral estoppel, and lack of a fiduciary duty.[8]

6. New NGC joined the NGC Asbestos Disease and Property Damage Trust as an involuntary plaintiff on July 24, 1998. However, the court of appeals subsequently severed and abated all claims made by and against the Asbestos Claimants. Thus, we express no opinion regarding the issues concerning the Asbestos Claimants and omit any background and procedural history concerning this party.

7. The TCW Group, Inc. did not move for summary judgment at the same time as the other TCW defendants because it had filed a special appearance. The TCW Group, Inc. moved for summary judgment on March 5, 1999 on the same grounds applicable to the other TCW defendants. The motion for summary judgment was granted in part and denied in part on April 21, 1999 on the same grounds as applicable to the other TCW defendants.

8. Prostok and the Asbestos Claimants also moved for summary judgment on New NGC's cross-claim and the counterclaims of the Officers and Directors and DLJ, which sought to enforce the fee-shifting provision of the bankruptcy plan. This provision provided that in any suit contesting any action or inaction of certain parties (including the Officers and Directors, New NGC, or their financial advisors) as not being in good faith, the losing party would be required to pay the prevailing parties reasonable attorneys' fees and costs. The trial court granted Prostok and the Asbestos Claimants' motion for summary judgment. The court of appeals reversed the trial court. Prostok does not raise this issue to this Court. Accordingly, we omit any discussion regarding litigation on the fee-shifting provision from our opinion.

On March 1, 1999, the trial court specifically denied TCW's motion for summary judgment on limitations grounds but granted summary judgment in favor of the Officers and Directors, TCW, and New NGC without specifying grounds. On April 21, 1999, the trial court signed a final judgment and dismissed New NGC's plea in intervention as moot.

## C. Appeals

Prostok appealed the trial court's final take-nothing judgment. Subsequently, DLJ and several of the Officers and Directors settled their disputes with Prostok and the class. Accordingly, the court of appeals severed the claims between these parties and remanded them to the trial court to effectuate their settlements. Thus, the remaining parties on appeal were Prostok, the non-settling Officers and Directors,[9] TCW, and New NGC.

Prostok complained on appeal that the trial court erred in granting summary judgment on his claims against the Officers and Directors and TCW. The court of appeals held that none of the theories asserted by the Officers and Directors could support summary judgment. The court of appeals reversed the summary judgment granted in favor of the Officers and Directors against Prostok.

TCW cross-appealed the trial court's denial of its motion for summary judgment on statute of limitations grounds. The court of appeals held that TCW's motion for summary judgment on statute of limitations grounds was meritorious. Thus, the court of appeals effectively affirmed the trial court's judgment in favor of TCW on different grounds than the trial court articulated in its judgment.[10] New NGC cross-appealed, complaining that the trial court erred in failing to consider and sustain New NGC's standing argument as an alternative ground for dismissal.[11] The court of appeals reversed the trial court's dismissal of New NGC's intervention as to the surviving causes of action. The court of appeals remanded this "ownership" issue to the trial court as a challenge to capacity to sue, instead of as a standing issue as it was raised by New NGC. Therefore, the court of appeals held that Prostok take nothing from TCW because of statute of limitations but remanded all other pending claims to the trial court.

The Officers and Directors petitioned this Court for review, arguing that the court of appeals erred in reversing summary judgment. Specifically, they argue that summary judgment was proper because: 1) Prostok's claims are an impermissible collateral attack on the bankruptcy court's final judgment; 2) Texas law does not recognize the duty on which Prostok's claim relies; 3) Prostok's claims, which arise from alleged misconduct in

---

9. The non-settling Officers and Directors are Peter C. Browning, Edward A. Porter, Autino O. Maraia, Bernard Kasriel, Gerard P. Carroll, and Cynthia Hartley.

10. The relevant portion of the court of appeals' judgment reads:

That portion of the trial court's judgment denying summary judgment on the grounds of the statute of limitations is REVERSED and judgment is hereby RENDERED that Jeff P. Prostok, Jackie Field, Jr., and Alfred Earnest, and all others similarly situated, take nothing by way of their claims against TCW Special Credits, Trust Company of the West, TCW Asset Management Company, and The TCW Group Inc.

Because TCW was successful on other grounds at the trial court, the reversal on their cross-appeal effectively affirmed the trial court's judgment.

11. New NGC, joined by the Officers and Directors, also complained on appeal that the trial court erred in granting summary judgment against it on its cross-claims for attorneys' fees under the fee-shifting provisions of the reorganization plan. See supra note 7.

prior litigation, are precluded under this Court's holding in *Trevino v. Ortega*, 969 S.W.2d 950 (Tex.1998); 4) the court of appeals erred in reversing summary judgment on the ground that Prostok could rely on federal bankruptcy law for the existence of a fiduciary duty in state court; and 5) summary judgment was proper on Prostok's conspiracy claim because it derives from Prostok's other alleged tort claims.

New NGC also petitioned this Court for review arguing that the court of appeals erred in holding that its claim of ownership merely raised an issue of capacity to sue. New NGC argues that Prostok lacks standing to bring claims for harm suffered by the estate. Lastly, Prostok petitions this Court for review arguing that the court of appeals erred in holding that its claims against TCW were barred by limitations.

## II. Standard of Review

■ In a summary judgment motion brought under Texas Rule of Civil Procedure 166a(c), the moving party has the burden of showing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *Provident Life Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex.2003).

■ The trial court's order specifically rejected the motions based on statute of limitations but does not specify which of the remaining grounds asserted formed the basis of its summary judgment. Thus, we may affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Id.* at 216.

## III. Finality of Confirmation Orders

■ Section 1144 of the United States Bankruptcy Code provides that upon proper request made within 180 days of the entry of the confirmation order and after notice and a hearing, the bankruptcy court may revoke the order if and only if the order was procured by fraud. 11 U.S.C. 1144. Section 1144 provides the exclusive means for revoking a confirmation order. *Dale C. Eckert Corp. v. Orange Tree Assocs. (In re Orange Tree Assocs.)*, 961 F.2d 1445, 1447 n. 6 (9th Cir.1992) (quoting *In re Longardner & Assocs.*, 855 F.2d 455, 460 (7th Cir.1988)); *In re Newport Harbor Assocs.*, 589 F.2d 20, 23–24 (1st Cir.1978). Any attempt to revoke a confirmation order after expiration of the 180–day limitations period is barred even if the alleged fraud is not discovered until then. *In re Orange Tree Assocs.*, 961 F.2d at 1447; *see also Farley v. Coffee Cupboard, Inc. (In re Coffee Cupboard, Inc.)*, 119 B.R. 14, 19 (E.D.N.Y.1990) ("The 180 day time limit in Section 1144 has been strictly enforced by the courts ... even to the extent of enforcing it in those cases where the alleged fraud of the debtor is not discovered until after the limitations period.") (citations omitted).

In accordance with these principles, the First Circuit in *Newport Harbor* held that notwithstanding the court's traditional equitable powers or powers conferred by Federal Rule of Civil Procedure 60(b), a motion seeking to revoke an order confirming a Chapter 11 reorganization plan filed three years outside the applicable limitations period was filed too late.[12] 589 F.2d. at 23–24. However, the First Circuit also recognized that while the revocation provision provides the exclusive means for revoking a confirmation plan for fraud, it does not necessarily provide the exclusive

---

**12.** Federal Rule of Civil Procedure 60(b) permits a court to relieve a party from final judgment for several enumerated reasons, including fraud by an adverse party.

remedy for debtors or creditors who have been injured by fraud. *Id.* at 24 (applying the Bankruptcy Act predecessor to Bankruptcy Code Section 1144 and stating, "Our opinion should not be read to suggest that the Debtors or other creditors who may have been injured by fraud are necessarily without other remedies in other forums."). The court recognized that the "doctrines of res judicata and collateral estoppel would not bar such an action, *at least where the alleged fraud could not have been asserted in the bankruptcy proceedings, the underlying factual claims were not actually adjudicated, and the relief sought would not upset the confirmed plan of arrangement.*" *Id.* (emphasis added).

Some federal courts have held that Section 1144 is not the exclusive remedy for debtors or creditors subject to a fraudulently obtained confirmation order *if* an independent action may otherwise be maintained for the fraudulent conduct. *See id.; see also In re Coffee Cupboard, Inc.,* 119 B.R. at 19 ("Section 1144 does not act as a bar to truly independent courses of action based on a debtor's wrongful conduct."). However, debtors and creditors "may not attack confirmation orders by simply characterizing their attempt as an independent cause of action." *In re Coffee Cupboard, Inc.,* 119 B.R. at 19. The Fifth Circuit has also determined that even though an action has an independent purpose and contemplates some other relief, "it is a collateral attack if it must in some fashion overrule a previous judgment." *Miller v. Meinhard–Commercial Corp.,* 462 F.2d 358, 360 (5th Cir.1972).

■ An action is not truly independent when maintenance of the action would violate established finality doctrines or constitute an impermissible collateral attack on the confirmation order. *See In re Newport Harbor Assocs.,* 589 F.2d at 24

(recognizing that a subsequent action could be barred by res judicata and collateral estoppel). Section 1144 provides a means, within a prescribed time limit, to revoke a confirmation order under limited circumstances. *F & M Marquette Nat'l Bank v. Emmer Bros. Co. (In re Emmer Bros. Co.),* 52 B.R. 385, 390 (D.Minn.1985). A collateral attack brought outside Section 1144's strict time limit represents nothing more than an impermissible attempt to enlarge the time limit. *See id.* at 391 (noting that the Section 1144 time limit cannot be enlarged, and later noting that if an action for fraud is construed as an attempt to revoke the confirmation order, then it is barred by the limitations period in Section 1144). An attempt to revoke a confirmation order in a separate proceeding is a collateral attack on the order. *See id.* (holding that creditors' complaint was "not an attempt to revoke or otherwise collaterally attack the confirmation order that is subject to the limitations period of Section 1144"). An action which, *in effect,* attempts to revoke a confirmation order is also a collateral attack. *See Miller,* 462 F.2d at 360 ("[I]t is a collateral attack if it must in some fashion overrule a previous judgment."). Thus, if Prostok's claims constitute an impermissible collateral attack on the confirmation order, Section 1144 of the Bankruptcy Code provides his exclusive remedy. We now turn to whether Prostok's claims constitute an impermissible collateral attack.

## IV. Collateral Attack

■ Collateral attacks on final judgments are generally disallowed because it is the policy of the law to give finality to the judgments of the courts. *Tice v. City of Pasadena,* 767 S.W.2d 700, 703 (Tex. 1989) (quoting *Crouch v. McGaw,* 134 Tex. 633, 138 S.W.2d 94, 96 (1940)).

[T]he mischief of retrying every case in which the judgment or decree rendered on false testimony, given by perjured witnesses, or on contracts or documents whose genuineness or validity was in issue, and which are afterwards ascertained to be forged or fraudulent, would be greater, by reason of the endless nature of the strife, than any compensation arising from doing justice in individual cases.

*United States v. Throckmorton*, 98 U.S. 61, 68–69, 25 L.Ed. 93 (1878). This policy of finality is especially important in a Chapter 11 bankruptcy, where the proceedings are intended to rehabilitate a business. A confirmation plan affects the rights of, and restructures the relationships between, the debtor and its creditors. *In re Newport Harbor Assocs.*, 589 F.2d at 22. If the rehabilitative purpose of Chapter 11 is to be realized, Chapter 11 proceedings must be "concluded with reasonable expedition and finality so as to allow certainty for future business planning." *Id.; see also Kaufman v. Pub. Serv. Co. (In re Pub. Serv. Co.)*, 43 F.3d 763, 768 (1st Cir.1995) ("[T]he willingness of future claimants and creditors to compromise in chapter 11 proceedings depends on giving the reorganization court's approval a due measure of finality."); *Christopher v. Am. Universal Ins. Group (In re Christopher)*, 148 B.R. 832, 837 (Bankr.N.D.Tex.1992) ("A strong policy favors enforcement of the plan of reorganization because too many rights of too many interests have relied on the finality of the confirmation order."). A collateral attack runs counter to this strong policy of finality because a collateral attack attempts to bypass the appellate process in challenging the integrity of a judgment.

■■■■■ A collateral attack is an attempt to avoid the binding force of a judgment in a proceeding not instituted for the purpose of correcting, modifying, or vacat-

ing the judgment, but in order to obtain some specific relief which the judgment currently stands as a bar against. *Crawford v. McDonald*, 88 Tex. 626, 33 S.W. 325, 327 (1895); *see also Biaza v. Simon*, 879 S.W.2d 349, 353 (Tex.App.—Houston [14th Dist.] 1994, writ denied) (citing *Crawford*, 33 S.W. at 327). Only a void judgment may be collaterally attacked. *Browning v. Placke*, 698 S.W.2d 362, 363 (Tex.1985). A judgment is void only when it is apparent that the court rendering judgment "had no jurisdiction of the parties or property, no jurisdiction of the subject matter, no jurisdiction to enter the particular judgment, or no capacity to act." *Id.* (citing *Austin Indep. Sch. Dist. v. Sierra Club*, 495 S.W.2d 878, 881 (Tex.1973)). A confirmation order issued by a bankruptcy court has the effect of a judgment rendered by a district court. *Miller*, 462 F.2d at 360; *In re Emmer Bros.*, 52 B.R. at 390. Prostok does not argue that the bankruptcy order was void; therefore, any collateral attack is improper.

■■■■ The heart of Prostok's complaint is that the alleged misconduct of the Officers and Directors and TCW during the bankruptcy proceedings resulted in the bankruptcy court's undervaluation of National Gypsum. In turn, he argues, the Junior Bondholders received less than what they would have received had the estate been properly valued. To calculate the damages incurred by Prostok and the Junior Bondholders he represents, a court would need to determine not only how much larger the bankruptcy estate would have been but for the defendants' conduct, but also what percentage of the estate each class of creditors would have been entitled to if the bankruptcy court had considered the larger estate. Thus, while Prostok's action contemplates relief other than revoking the confirmation order, it necessarily challenges the integrity of the

order and results in a review, perhaps a recalculation, of the bankruptcy determinations of the assets to which some claimants are entitled. *See Miller*, 462 F.2d at 360 (holding an unsecured creditor's post-confirmation suit against a secured creditor for fraudulent misrepresentation at a creditors' meeting constituted a collateral attack on the confirmation order); *Mitchell v. Village Creek Drainage Dist.*, 158 F.2d 475, 477–78 (8th Cir.1946) (state law defining collateral attack generally as a separate proceeding in which the integrity of the judgment is challenged even if brought with some independent purpose); *In re French Gardens, Ltd.*, 58 B.R. 959, 963 (Bankr.S.D.Tex.1986) ("Though an action may have an independent purpose and may contemplate some other relief, it is a collateral attack if it must in effect overrule a previous judgment."). The success of Prostok's state court suit necessarily turns upon what the judgment of the bankruptcy court should have been. *See Miller*, 462 F.2d at 360.

■ The court of appeals held that Prostok's claims do not collaterally attack the confirmation order because they are based on conduct extrinsic to the confirmation order. 112 S.W.3d 876, 905. This Court has held that when a party does not seek to set aside a prior judgment, but instead brings suit based on extrinsic fraud, the action is not a collateral attack. *State v. Durham*, 860 S.W.2d 63, 67 (Tex. 1993) (recognizing, in a suit brought by the state for fraud in obtaining court approval for an oil and gas lease, that the State had not sought to set aside the judgment but had "alleged fraud extrinsic to the judgment, and invoke[d] the equity powers of the court to impose a constructive trust"); cf. *Spera v. Fleming, Hovenkamp & Grayson, P.C.*, 25 S.W.3d 863, 871 (Tex.App.— Houston [14th Dist.] 2000, no pet.) (holding that extrinsic conduct that formed the basis of claims for attorney malpractice and breach of fiduciary duty were not a collateral attack on trial court's order apportioning attorneys' fees). In contrast, the underlying issues resolved by a judgment are considered intrinsic. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 752 (Tex.2003) ("Issues underlying the judgment attacked by a bill of review are intrinsic and thus have no probative value on the fraud necessary to [support] a bill of review."). An attack on a final judgment, otherwise constituting a collateral attack, cannot be maintained on grounds that the judgment was obtained through fraudulent conduct intrinsic to the judgment. *See Neill v. Neill*, 386 S.W.2d 642, 647 (Tex. Civ.App.—Austin 1965, writ dism'd) ("Neither a collateral nor a direct attack upon a prior judgment can be based upon intrinsic fraud.").

■ Extrinsic fraud is fraud that denies a losing party the opportunity to fully litigate at trial all the rights or defenses that could have been asserted. *Montgomery v. Kennedy*, 669 S.W.2d 309, 312 (Tex. 1984) (citing *Alexander v. Hagedorn*, 148 Tex. 565, 226 S.W.2d 996, 1001 (1950)). It generally includes wrongful conduct occurring outside of the adversarial proceedings. *See Hagedorn*, 226 S.W.2d at 1002 (citing *Phillips Petroleum Co. v. Jenkins*, 91 F.2d 183, 187 (8th Cir.1937)). The fraud must be collateral to the matter tried and not something which was actually or potentially in issue. *Montgomery*, 669 S.W.2d at 312. For example, a fiduciary's concealment of material facts to induce an agreed or uncontested judgment, which prevents a party from presenting his legal rights at trial, is extrinsic fraud. *Id.* at 313.

■ Intrinsic fraud, by contrast, "relates to the merits of the issues [that] were presented and presumably were or should have been settled in the former

action." *Tice*, 767 S.W.2d at 702. Intrinsic fraud includes fraudulent instruments, perjured testimony, or any matter which was actually presented to and considered by the trial court in rendering judgment. *Id.; see also Montgomery*, 669 S.W.2d at 313 ("It is particularly well-established that the alleged perjury of a witness on a contested issue, which the opposing party had the opportunity to refute, is intrinsic fraud."). Allegations that a plaintiff conspired to suborn perjury is an allegation of intrinsic fraud. *Tice*, 767 S.W.2d at 702. In addition, when the fraudulent acts themselves are in issue, or could have been in issue, in the prior proceeding, the fraud is intrinsic. *Montgomery*, 669 S.W.2d at 313 (citing *Mills v. Baird*, 147 S.W.2d 312, 316 (Tex.Civ.App.—Austin 1941, writ ref'd)). This Court has noted that while concealment of a material fact by a fiduciary charged with the duty of full disclosure generally is extrinsic fraud, where "the alleged specific fraudulent acts were known and *in issue* in the prior suit, the fraud is intrinsic." *Id.* at 313–14. Similarly, the First Circuit affirmed a bankruptcy court's injunction barring a civil action for fraud occurring in Chapter 11 proceedings "[b]ecause the alleged inaccuracies could have been, and in part were, litigated in the bankruptcy court." *In re Pub. Serv. Co.*, 43 F.3d at 768.

The distinction between extrinsic and intrinsic fraud as grounds for attacking a judgment represents a balance of competing concerns. On one hand, the sound policy of promoting finality in judgments arises from a general level of confidence that the adversarial process leading to judgment is reasonably effective to ascertain the merits of the controversy. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 70 cmt. a (1982). While no system is infallible, "[e]ndless litigation, in which nothing was ever finally determined, would be worse than occasional miscarriages of justice." *Hagedorn*, 226 S.W.2d at 998 (quoting *Pico v. Cohn*, 91 Cal. 129, 25 P. 970, 971 (1891)). On the other hand, to fully insulate judgments from attack would give great protections to the most devious parties. *See.* RESTATEMENT (SECOND) OF JUDGMENTS § 70 cmt. a (1982) ("[I]f judgments were wholly immune it would give powerful incentive to use ... fraudulent tactics in obtaining a judgment."). As such, an attack upon a judgment based on intrinsic fraud is not allowed because the fraudulent conduct may be properly exposed and rectified within the context of the underlying adversarial process itself. In contrast, a collateral attack on a judgment on the basis of extrinsic fraud is allowed because such fraud distorts the judicial process to such an extent that confidence in the ability to discover the fraudulent conduct through the regular adversarial process is undermined. *See Throckmorton*, 98 U.S. at 65 ("But there is an admitted exception to this general rule [of finality] in cases where, by reason of something done by the successful party to a suit, there was in fact no adversary trial or decision of the issue in the case."); *see generally* 47 AM.JUR.2D *Judgments* § 929 (1995) (citing *Peet v. Peet*, 16 Va.App. 323, 429 S.E.2d 487, 490 (1993)).

It is undisputed that the BT Committee represented the interests of Prostok and the other Junior Bondholders in the bankruptcy proceedings. 112 S.W.3d at 885. In January 1992, the BT Committee filed a motion requesting appointment of a Chapter 11 trustee to replace National Gypsum's management pursuant to Section 1104 of the Bankruptcy Code. One of the grounds alleged was that management intentionally undervalued National Gypsum by manipulating downward the company's value arising from its business plan. Specifically, the BT Committee claimed that "[m]anagement intentionally understated

all its forecasts to hide its objective views of the company and to hide the company's value." In addition, the BT Committee asserted that this "manipulation [was] a weapon [m]anagement has used to try to eliminate the consensual plan forged by the BT Committee and to promote a war between the senior and junior bondholders." The BT Committee made similar arguments at the hearing on the motion, making clear that the "debtor's business plan is the driver of Chapter 11 plan negotiations because from that busi-ness [sic] plan, which typically extends several years into the future, future profits and cash flow are measured, and the valuation of a business is measured. If that business plan is manipulated down-wards [sic] ... it affects the ultimate outcome of the case in a major way." In March 1992, the bankruptcy court rejected the BT Committee's motion for appointment of a trustee, and specifically held that the BT Committee had not met its burden to prove that National Gypsum's management had intentionally manipulated the company's business plan.

National Gypsum submitted a reorganization plan to the bankruptcy court based on a valuation of $350 million. In November 1992, the BT Committee objected to the confirmation of this plan. Again, the BT Committee raised an allegation of intentional undervaluation. The BT Committee alleged, among other things, that "[National Gypsum] management [had] systematically exploited the plan process and intentionally manipulated downward its business projections and [National Gypsum's] value." Further, the BT Committee alleged that this plan was supported by a small creditor faction "[i]n exchange for greater than 100% recovery and control of the reorganized company's board of directors." Confirmation hearings on the proposed plan began on December 7, 1992. On March 9, 1993, the Bankruptcy Court entered its order confirming National Gypsum's reorganization plan and its supporting findings of fact and conclusions of law. The bankruptcy court expressly overruled all objections to the confirmation of the plan and found that the debtor solicited the plan in good faith.

In this case, Prostok complains that the Officers and Directors intentionally misled the bankruptcy court regarding the proper valuation of National Gypsum. The controlling question is "whether the alleged fraud prevented the party from knowing about and presenting [their] legal rights at trial." *Montgomery*, 669 S.W.2d at 314. The alleged fraudulent conduct, the misrepresentation of the value of National Gypsum, is a material issue that was presented and considered by the bankruptcy court over two years before Prostok filed this suit. The conduct was considered by the bankruptcy court in rendering judgment—specifically, when the trial court denied the BT Committee's motion to appoint a trustee and again in overruling the BT Committee's objection to the confirmation of National Gypsum's proposed reorganization plan. The fraud Prostok now alleges did not prevent the Junior Bondholders from presenting their legal rights in the bankruptcy proceedings. In fact, the BT Committee raised and litigated at the bankruptcy court the fraud Prostok now alleges. Fraud is intrinsic when the fraudulent conduct was in issue in the prior proceedings, even when the acts are committed by a fiduciary. *Id.* at 313–14. Because the fraud Prostok alleges was litigated in the bankruptcy proceedings, the alleged fraudulent conduct is intrinsic to the confirmation order. Therefore, Prostok's allegations based on intrinsic fraud constitute an impermissible collateral attack on the bankruptcy's confirmation order.

Prostok argues that, at a minimum, claims based on fraudulent conduct occurring post-confirmation could not have been subject to the confirmation order. It is axiomatic that fraud discovered post-confirmation could not have been litigated in the pre-confirmation bankruptcy proceedings. The post-confirmation conduct to which Prostok refers is the delayed implementation of a cost-savings plan. However, it is the misrepresentation of the proper valuation of National Gypsum, by failing to reveal this cost-savings plan to the bankruptcy court *during the bankruptcy proceedings,* that is ultimately the basis of Prostok's alleged damages. In addition, the implementation of a cost-savings plan simply does not present the type of new evidence of fraud necessary to justify deviation from the general rule of finality. *See In re Pub. Serv. Co.,* 43 F.3d at 768 ("Absent substantial *new* evidence of fraud, there is no reason why Congress would have wished, or the courts should permit, participants who actively participated in the reorganization to relitigate in later civil actions previously raised issues about the adequacy of the disclosure statement, or to reserve for such actions claims that feasibly could have been made in the reorganization.").

Prostok also argues that we cannot treat his claims as a collateral attack on the bankruptcy court's confirmation judgment because the bankruptcy court itself expressly rejected this argument. In ruling on Prostok's motion to remand, the bankruptcy judge held that the complaint did not give rise to ancillary jurisdiction under the Fifth Circuit's decision in *Baccus v. Parrish,* 45 F.3d 958, 960–61 (5th Cir.1995) (finding removal proper where a state suit sought to set aside provisions of a settlement agreement in a federal case). This ruling was subsequently upheld by the district court on appeal of the bankruptcy court's order remanding the case to state court. Specifically, the bankruptcy judge held that the "complaint does not seek to attack or undermine an order of this court." Even if these statements refer to the issue of whether Prostok's claims constitute a collateral attack on the judgment, because the bankruptcy court held that it lacked subject matter jurisdiction to rule on the substance of the case, the statements carry no preclusive effect on this Court's consideration of the substantive collateral attack defense. *See Smith v. Texas Children's Hosp.,* 172 F.3d 923, 926 (5th Cir.1999); *Soley v. First Nat'l Bank of Commerce,* 923 F.2d 406, 409 (5th Cir.1991) (citing *Whitman v. Raley's Inc.,* 886 F.2d 1177, 1181 (9th Cir. 1989)) ("We take comfort in the fact that, because we construe the order as jurisdictional, the district court's statements will have no preclusive effect on the state court's consideration of the substantive preemption defense.").

Finally, the court of appeals relies heavily on several federal cases for the proposition that "bankruptcy courts agree that Section 1144 does not bar fraud claims unless those claims would require revocation of a confirmed plan." 112 S.W.3d at 903 (citing *S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.),* 181 B.R. 457, 460 (Bankr.D.Ariz.1995); *In re Emmer Bros. Co.,* 52 B.R. at 392). In both of these cases the courts determined that the cause of action was the type of independent action contemplated in *Newport Harbor.* However, these cases are readily distinguishable from the case at hand.

In *Emmer Brothers,* a creditor bank sued a debtor for wrongfully withholding and concealing the existence of an asset, thereby obtaining a settlement agreement and order approving it on false pretenses. 52 B.R. at 388. The bankruptcy court dismissed the complaint on two grounds, one of which was that it was time barred

under Section 1144. On review, the district court held that the bank's complaint was "not an attempt to revoke *or otherwise collaterally attack* the confirmation order that is subject to the limitations of Section 1144." *Id.* at 391 (emphasis added). The action was allowed to proceed. Applying the test in *Newport Harbor*, the court determined that the plaintiff could not have asserted the fraud in the Chapter 11 proceedings. *Id.* at 392. Thus, unlike the case at hand, the alleged fraudulent conduct was not and could not have been asserted in the underlying bankruptcy proceedings.

Similarly, in *Circle K*, the creditors sought damages based on allegations of improper conduct, defective disclosures, and erroneous valuation information in connection with the debtor's plan of reorganization. 181 B.R. at 459. In determining whether the action was time barred by Section 1144, the bankruptcy court noted that "in applying *Newport Harbor*, courts look carefully at the cause of action and requested relief to determine if plaintiff is seeking to revoke [the] confirmation [order] or 'redivide the pie.'" *Id.* at 462. Finding that the bare requirements of *Newport Harbor* were met, the bankruptcy court noted that arguably the alleged fraud could not have been asserted in the confirmation proceedings and that the underlying claims certainly were not actually adjudicated. *Id.* at 462. Again, *Circle K* does not present the situation, as in this case, where the alleged fraud was in fact asserted in the underlying bankruptcy proceedings.

---

13. The court of appeals held that Prostok take nothing from TCW based on TCW's limitations defense. We affirm the judgment in favor of TCW but on the grounds described in this opinion. We do not reach TCW's limitations defense. The court of appeals also re-

## V. Conclusion

Because we hold that Prostok's suit constitutes an impermissible collateral attack on the confirmation order, we need not reach the other issues raised in the Officers and Directors', New NGC's, or Prostok's petitions for review. Accordingly, we reverse the judgment of the court of appeals in part and affirm in part, and render judgment that Prostok take nothing.[13]

Justice O'NEILL did not participate in the decision.

---

versed the trial court's dismissal of New NGC's plea in intervention. We do not decide whether the trial court's dismissal was proper since no cause of action upon which New NGC's plea in intervention was based survives this judgment.