



## OPINION

No. 04-11-00791-CV
No. 04-11-00814-CV

**CITY OF SAN ANTONIO**
Acting through City Public Service Board of San Antonio a/k/a CPS Energy,
Appellant

v.

**CASEY INDUSTRIAL, INC.**,
Appellee

From the 408th Judicial District Court, Bexar County, Texas
Trial Court Nos. 2008-CI-06252 & 2008-CI-06252
Honorable Larry Noll, Judge Presiding

Opinion by:     Sandee Bryan Marion, Justice

Sitting:        Sandee Bryan Marion, Justice
                Rebecca Simmons, Justice
                Steven C. Hilbig, Justice

Delivered and Filed:  August 1, 2012

REVERSED AND RENDERED; REVERSED AND REMANDED FOR FURTHER
PROCEEDINGS

These are two consolidated accelerated appeals arising from orders in favor of Casey

Industrial, Inc. ("Casey"). In the first order, the trial court granted Casey's motion for summary

judgment, holding that the parties' contract was void. The trial court granted the parties

permission to appeal pursuant to Texas Civil Practice and Remedies Code section 51.014(d).[1] In the second order, the trial court denied the plea to the jurisdiction filed by the City of San Antonio Acting through City Public Service Board of San Antonio a/k/a CPS Energy (hereinafter, "CPS"). CPS appealed pursuant to Texas Civil Practice and Remedies Code section 51.015(a)(8).[2] On the parties' motion, this court consolidated the two appeals. On the issue of whether the contract is void, we reverse the summary judgment in favor of Casey, render summary judgment in favor of CPS, and remand for further proceedings. On CPS's plea to the jurisdiction, we reverse the trial court's order denying the plea and we render judgment that Casey's quantum meruit claim against CPS is dismissed for want of jurisdiction.

## BACKGROUND

In an effort to reduce air pollution at the J.T. Deely power plant, CPS proposed to install two baghouses, which are multi-story, warehouse-size structures that collect fly ash, a by-product of the coal combustion process. CPS chose a design-build project delivery method for the design and construction of the baghouses, and offered the project for competitive bidding. Casey responded and submitted a proposal that identified Wheelabrator Air Pollution Control, Inc. ("Wheelabrator") as the subcontractor to Casey and as both the baghouse supplier and as

---

[1] "On a party's motion or on its own initiative, a trial court in a civil action may, by written order, permit an appeal from an order that is not otherwise appealable if:

> (1) the order to be appealed involves a controlling question of law as to which there is a substantial ground for difference of opinion; and
> (2) an immediate appeal from the order may materially advance the ultimate termination of the litigation."

TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(d) (West 2011).

[2] "A person may appeal from an interlocutory order of a district court, county court at law, or county court that . . . grants or denies a plea to the jurisdiction by a governmental unit as that term is defined in Section 101.001 . . . ." *Id.* § 51.015(a)(8).

primary engineer for the balance of plant services. Casey also identified Wheelabrator as its technology partner and it included Wheelabrator as part of its engineering team.

CPS eventually selected Casey and requested a meeting with Casey for the purpose of negotiating a contract. As part of the contract, CPS was required to secure payment and performance bonds from Casey. During the negotiation process, Casey informed CPS that it could not bond Wheelabrator's work. To address the bonding issue, CPS agreed to Casey's proposal that the scope of the work for the project be divided between Casey, which would perform the design and construction of the baghouses, and Wheelabrator, which would perform the equipment design and supply tasks. The contract the parties negotiated was signed by CPS, Casey, and Wheelabrator.

The underlying dispute arose when Wheelabrator was allegedly unable to meet its obligations and Casey incurred additional costs to satisfy those obligations. Casey then sued CPS to recover these additional costs, alleging three causes of actions: implied in law/quasi-contract, quantum meruit, and breach of contract. Casey moved for a partial summary judgment on two grounds: (1) the contract is void because CPS violated statutory procurement laws and (2) Casey is entitled to recover under the doctrine of quantum meruit. CPS moved for summary judgment on a variety of grounds: (1) Casey lacks standing to bring its claim, (2) Casey's claim is moot; and (3) the contract is not void because CPS complied with the appropriate procurement laws and/or its own internal procurement procedures. The trial court denied CPS's motion. The trial court granted Casey's motion, specifically holding the contract was "void because [sic] not a design build contract and in house procurement procedures did not save it." The court also held Casey "is entitled to prove liability, if any, and damages, if any, under the doctrine of quantum meruit."

CPS also filed a plea to the jurisdiction on the ground that it was immune from suit for additional work or for quantum meruit. The trial court denied the plea.

On appeal, CPS raises two issues: (1) the trial court erred in granting Casey's motion for summary judgment and in denying its motion for summary judgment, and (2) the trial court erred in denying CPS's plea to the jurisdiction because there is no waiver of governmental immunity from suit for quantum meruit claims. On appeal, CPS does not challenge the trial court's denial of its motion for summary judgment on the grounds that Casey lacks standing; Casey's claim is moot, CPS's affirmative defense of laches, or CPS's affirmative defense of unclean hands. Instead, on appeal, CPS asks only that its "motion for summary judgment declaring the contract valid be granted and the case remanded for trial on [the parties'] breach of contract claims." As to this issue, in its motion for summary judgment, CPS asserted it is not required to follow the statutory competitive-bidding requirements because it is exempt from those requirements, and, even if not exempt, the undisputed evidence shows the contract complies not only with Texas Local Government Code Chapter 271 but also with CPS's internal procurement policies.

## STANDARD OF REVIEW

We review an order granting a traditional motion for summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). A traditional motion for summary judgment should be granted only when the movant establishes there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law on the grounds expressly set forth in the motion. TEX. R. CIV. P. 166a(c); *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex. 2005). When parties file cross-motions for summary judgment on overlapping issues and the trial court grants one motion and denies the other, we review the summary judgment evidence supporting both motions and determine all questions presented and preserved. *See FM*

*Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).  We "should render the judgment that the trial court should have rendered." *Id.*

## IS THE CONTRACT VOID?

The parties' contract was executed in August 2004.  At that time, subchapter H of Local Government Code Chapter 271 was in effect.[3]  In its motion for summary judgment, Casey argued that CPS violated subchapter H by, after selecting the design-build method of delivery for the project, failing to execute a design-build contract because it did not contract with a "single entity" or "offeror" (*i.e.*, only Casey) that had exclusive responsibility for the project.  Instead, according to Casey, CPS improperly contracted with more than one entity, one of which was not an "offeror" (*i.e.*, Wheelabrator).  Casey asserts Wheelabrator is not an "offeror" as that word is used in section 271.119 because it did not submit any of the required responses to the request for qualifications or the request for preliminary proposals during the competitive bidding process.  Casey also disputes whether the contract is a "design-build contract."  Casey argues that it is not because CPS failed to contract with a "single entity" for the complete scope of design and construction work, as well as a "single entity" that had complete financial responsibility.  Casey concluded that CPS's failure to comply with Local Government Code Chapter 271 subchapter H renders the contract void as against public policy.  *See* TEX. LOC. GOV'T CODE § 271.112(f) ("A contract entered into or an arrangement made in violation of this subchapter [H] is contrary to public policy and is void.").  In its motion for summary judgment, CPS argued that although it was not required to comply with Chapter 271, the contract does in fact comply with the requirements of that chapter and, in any event, the contract also complies with its internal procurement procedures.  We begin our analysis of the parties' competing arguments with a

---

[3] Repealed by Acts 2011, 82nd Leg., R.S., ch. 1129, § 5.01(3), effective Sept. 1, 2011.49, 1987 Tex. Gen. Laws 1306, now codified as Tex. Loc. Gov't Code §§ 43.052, .053, .056.  All further references are to the Local Government Code effective in 2004.

review of the competitive bidding process required by section 271.119 and the parties' participation in that process.

Pursuant to section 271.119(c), CPS prepared "a request for qualifications that include[d] general information on the project site, project scope, budget, special systems, selection criteria, and other information that may assist potential design-build firms in submitting proposals for the project . . . [and] prepare[d] a design criteria package that include[d] more detailed information on the project." *See id.* § 271.119(c). Also pursuant to section 271.119(c), CPS prepared a "Request for Preliminary Proposals for Design-Build of the Proposed [baghouse project]" ("the RFPP"), which included information on the project scope, project site, and design criteria. The purpose of the request was to "solicit preliminary proposals . . . from parties (hereinafter referred to as 'Firm,' 'Team(s),' and/or 'Offeror') interested in providing design-build services . . . ." In the "Procurement Process and Contract Requirements" section of the RFPP, CPS stated as follows:

> CPS intends to evaluate Preliminary Proposals submitted in response to the RFPP to short-list no more than five (5) Teams CPS deems most qualified to submit Proposals. CPS will then solicit Final Proposals from the short-listed Teams and will determine the Team (the "Design-Build Contractor or D/B Contractor") that has offered the best value to CPS. Once a Team has been short-listed, no changes to the Team members will be allowed. For purposes of this RFPP, the term "Team member" shall mean each entity identified in the Preliminary Proposal (or later approved for inclusion) as a member of the Team, whether such entity is proposed as an equity owner, Subcontractor or Subconsultant. A Subcontractor or Subconsultant may be on one or more proposing Teams.

Casey responded to CPS's RFPP by letter in which it stated as follows:

> [Casey] appreciates the opportunity to respond to this preliminary proposal. [Casey] would serve as the Design/Build contractor and provide overall project management and be the construction team member. [Wheelabrator] would be the subcontractor to Casey and be both the baghouse supplier and primary engineer for [the] balance of plant services.

Attachments to the letter included information for the entire scope of work and identified Wheelabrator as "a subcontractor to Casey." Attached as an exhibit to the letter is an "Offeror Information Form" that identifies Casey as "offeror" and "Construction Team Member." Casey signed the response as "Offeror." The Form indicated "engineering [was] to be performed [by]" a "Subcontractor." Another exhibit, also an "Offeror Information Form," identified Wheelabrator as "offeror," "Engineering Team Member," and "Baghouse Supplier."

Pursuant to section 271.119(d), CPS was then required to "evaluate statements of qualifications and select a design-build firm in two phases." *See id.* § 271.119(d). Casey does not dispute that CPS evaluated the information submitted by "the offerors on the basis of the selection criteria stated in the request for qualifications and the results of an interview." *See id.* § 271.119(d)(1). And, Casey does not dispute that CPS qualified "a maximum of five offerors to submit additional information." *See id.* No party contends CPS failed to "rank each proposal submitted on the basis of the criteria set forth in the request for qualifications" or failed to "select the design-build firm that submit[ed] the proposal offering the best value for the governmental entity on the basis of the published selection criteria and on its ranking evaluations." *See id.* § 271.119(d)(2). Finally, CPS did, in fact, "first attempt to negotiate a contract with the selected offeror," in this case, Casey. *See id.* § 271.119(d)(2).

Pursuant to section 271.119(d)(2), CPS selected Casey as one of five short-listed "offerors" from which it solicited final proposals. Although subchapter H uses the words "offeror" and "design-build firm," it does not define "offeror." Subchapter H defines a "design-build contract" as "a single contract *with a design-build firm* for the design and construction of a facility." *Id.* § 271.111(3) (emphasis added). Subchapter H defines a "design-build firm" as "a partnership, corporation, or other legal entity *or team* that includes an engineer or architect and

builder qualified to engage in building construction in Texas." *Id.* § 271.111(4) (emphasis added). CPS's RFPP defined "Offeror" as "any person, firm, corporation, joint venture, or consortium submitting a Proposal for the Work or their authorized representatives. The word 'Offeror,' the word 'Bidder' and the word 'Team' as used herein are synonymous." This definition is consistent with the use of the word "offeror" in section 271.119 as the party that responds to CPS's requests for qualifications and proposals.

Thus, both CPS's RFPP and section 271.119 appear to use the word "offeror" to mean the "design-build firm" or "team" that (1) submits the responses to the requests for qualifications and proposals and (2) negotiates the contract. But, Casey insists the contract is void and it relies on language taken from two sections of the contract. Casey contends the following sentence in sentence 14.1.2 authorizes the recovery of additional compensation from CPS because of the alleged failures of Wheelabrator:

> Provided D/B Contractor [Casey] is not in default itself, a Default by Wheelabrator under Section 14.1.1, which results in an impairment or frustration of D/B Contractor's Work through no fault of D/B Contractor, shall be considered a "Force Majeure" event and will entitle D/B Contractor to request an extension of time and/or additional compensation by Notice to Owner as required in Section 9.1.3.

Casey argues that "[u]nder a true design-build contract, under no circumstances would the design-build contractor be entitled to seek additional compensation from the Owner for a default by a member of the design-build 'team.'" Casey relies on section 20.20 of the contract for its argument that the contract itself reveals it did not have exclusive responsibility for the project because "the correction of issues as it related to design and the performance guarantees around such design were [Wheelabrator's] alone."

Casey points to no express statutory language in the Local Government Code as support for its arguments, and we disagree with Casey's interpretation of the parties' contract when the

entireties of both sections are read in context with the contract as a whole. Paragraph 14.1.2 of the contract reads in full as follows:

It is recognized that if D/B Contractor or Wheelabrator is adjudged bankrupt, or makes a general assignment for the benefit of creditors, or if a receiver is appointed on account of its insolvency, such could impair or frustrate D/B Contractor's or Wheelabrator's performance of its portion of the Work under this Agreement. Accordingly, it is agreed that upon occurrence of any such event, or the initiation of proceedings that may lead to any such event, Owner may request of D/B Contractor or its successor in interest adequate assurance of it or Wheelabrator's future performance in accordance with the terms and conditions of this Agreement. Failure to comply with such request within thirty (30) days after delivery of the request shall entitle Owner to terminate this Agreement and to the accompanying rights for a termination by Owner pursuant to Section 14.2. In all events, pending receipt of adequate assurance of performance and actual performance in accordance therewith, Owner may proceed with the Work with its own forces or with contractors on a time-and-material or other appropriate basis, the cost of which will be deducted from the D/B Contractor's Contract Price (if termination is due to the default of D/B Contractor) and/or Wheelabrator's Contract Price. In the event of bankruptcy by Wheelabrator wherein Owner is owed monies or has a claim for payment of monies that is jeopardized or extinguished by such bankruptcy, Owner shall be entitled to present the Negotiable Instruments as contemplated by Section 12.3 in settlement of Owner's Claims and/or damages incurred by reason of such bankruptcy. Provided D/B Contractor is not in Default itself, a Default by Wheelabrator under Section 14.1.1, which results in an impairment or frustration of D/B Contractor's Work through no fault of D/B Contractor, shall be considered a "Force Majeure" event and will entitle D/B Contractor to request an extension of time and/or additional compensation by Notice to Owner as required in Section 9.1.3.

Section 9.1.3 requires the D/B Contractor to provide the Owner with notice of any changes or modifications in the work that D/B Contractor believes will entitled it "to a Change Order modifying the Scope of Work, Project Schedule, Contract Price, or other obligations of D/B Contractor under" the contract. Section 9.1.3 places the burden on the D/B Contractor to establish "that it is entitled to such relief under Section 9.1.4, that the relief sought is the minimum relief required, and that any monetary relief requested by D/B Contractor is in excess of any insurance proceeds recoverable by D/B Contractor." Section 9.1.4 provides the circumstances for which the D/B Contractor may request relief under section 9.1.3, including

"Any Force Majeure." We conclude section 14.1.2 does nothing more than what a similar provision in any construction contract allows: it allows the contractor to seek additional compensation for additional work when a "change order" is properly submitted and approved by the owner.

Paragraph 20.20 of the contract reads in full as follows:

20.20 Split Contract. In consideration of a credit that was applied to the Fixed Lump Sum Amount of the Project as reflected in Attachment A, CPS and D/B Contractor[4] have agreed to "split" the scope of the Work between D/B Contractor and Wheelabrator as reflected in the matrix attached as Exhibit H. D/B Contractor agrees that it shall act as the overall construction manager of the Project and shall oversee Wheelabrator's and all other Subcontractor's performance under the agreement using the "design-build" Project delivery method and as consistent with a traditional turnkey project approach. Furthermore, D/B Contractor and its surety shall bear no responsibility or liability for the Wheelabrator obligations, Wheelabrator's design or the Performance Guarantees associated with the Wheelabrator portion of the Work; such Wheelabrator performance of its obligations hereunder to be secured with Negotiable Instruments provided under Section 12.3 by Parent Guarantee under Section 12.4 and LOC under Section 12.5.

Sections 12.3, 12.4, and 12.5 set forth Wheelabrator's obligation to submit performance security in the form of negotiable instruments, a guarantee from its parent company, and letters of credit. Reading paragraph 20.20 in its entirety, we conclude this paragraph does not, as Casey suggests, absolve Casey of "single point responsibility" for the project. Instead, this paragraph unambiguously establishes Casey as the "single entity" that must "act as the overall construction manager of the Project and . . . oversee Wheelabrator's and all other Subcontractor's performance under the agreement using the 'design-build' Project delivery method . . . ."

We conclude nothing in section 271.119 expressly requires the "offeror" to be a single entity. In fact, a "design criteria package" is defined as follows:

---

[4] The contract defines "D/B Contractor" or "Contractor" as "successful Offeror and its successors and permitted assigns." Casey was identified in the contract as the D/B Contractor.

> [A] set of documents that provides sufficient information *to permit a design-build firm* to prepare a response to a governmental entity's request for qualifications and any additional information requested, including criteria for selection. The design criteria package must specify criteria the governmental entity considers necessary to describe the project and may include, as appropriate, the legal description of the site, survey information concerning the site, interior space requirements, special material requirements, material quality standards, conceptual criteria for the project, special equipment requirements, cost or budget estimates, time schedules, quality assurance and quality control requirements, site development requirements, applicable codes and ordinances, provisions for utilities, parking requirements, or any other requirement, as applicable.

*Id.* § 271.111(5) (emphasis added).

More importantly, nothing in section 271.119 requires that only a single entity—whether designated as an "offeror" or not—sign the contract or be solely financially responsible under the contract. Instead, "[i]n using [the design-build method] and in entering into a contract for the services of *a design-build firm*, the contracting governmental entity and the *design-build firm* shall follow the procedures provided by this section." *See id.* § 271.119(a). We believe a consistent reading of section 271.119 indicates the use of "offeror" and "design-build firm" are interchangeable with regard to the execution of the contract. *See id.* § 271.111(3) (defining "design-build contract" as "a single contract *with a design-build firm* for the design and construction of a facility.") (emphasis added); *see also id.* § 271.111(4) (defining "design-build firm" to include a "*team*" that "includes an engineer or architect and builder qualified to engage in building construction in Texas.") (emphasis added).

We conclude CPS followed the procedures set forth in subchapter H, section 271.119 and entered into a "contract for the services of a design-build firm" with Casey and Wheelabrator pursuant to "the procedures provided by . . . section [271.119(a)]." Although the responses to CPS's requests for qualifications and proposals came under cover letters from Casey, Casey's attached documents identified both Casey and Wheelabrator as "offeror," also identified

Wheelabrator as "Engineering Team Member," and together Casey and Wheelabrator formed the "Team" submitting the responses. Therefore, we conclude CPS conclusively established that CPS, Casey, and Wheelabrator executed a valid design-build contract pursuant to section 271.119. Accordingly, the trial court erred by granting Casey's motion for summary judgment and by denying CPS's motion for summary judgment.[5]

## IMMUNITY FROM QUANTUM MERUIT CLAIMS

CPS also asserts the trial court erred in denying its plea to the jurisdiction on the grounds that it is immune from suit on the quantum meruit claim asserted against it by Casey. In a related appeal, submitted and considered the same day as these two appeals, a panel of this court considered this same issue. *See The City of San Antonio Acting By and Through City Public Serv. Bd. v. Wheelabrator Air Pollution Control, Inc.*, No. 04-11-00821-CV. For the reasons stated in that opinion, we hold CPS is immune from suit on Casey's quantum meruit claim; therefore, the trial court erred in denying CPS's plea to the jurisdiction.

## CONCLUSION

The summary judgment in favor of Casey on the issue of whether the contract is void is reversed, and summary judgment on the issue of whether the contract is valid is rendered in favor of CPS. We reverse the trial court's order denying CPS's plea to the jurisdiction and render judgment that Casey's quantum meruit claim against CPS is dismissed for want of jurisdiction. We remand the cause to the trial court for further proceedings consistent with this opinion.

Sandee Bryan Marion, Justice

---

[5] Because we conclude the parties executed a valid design-build contract pursuant to Subchapter H, section 271.119, we do not address CPS's contention that it is exempt from complying with statutory competitive bidding requirements and that it complied with its internal procurement procedures.