

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00293-CV

AMERICAN HOMEOWNER
PRESERVATION FUND, LP

APPELLANT

V.

BRIAN J. PIRKLE, TARRANT
COUNTY, TARRANT COUNTY
HOSPITAL DISTRICT, CITY OF
SANSOM PARK, AND TARRANT
COUNTY COMMUNITY COLLEGE
DISTRICT

APPELLEES

----------

FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 236-265110-13

----------

## OPINION

----------

## I. Introduction

In three issues, Appellant American Homeowner Preservation Fund, LP

(American) appeals a judgment declaring null and void its lien on property

purchased by Appellee Brian J. Pirkle at a tax-foreclosure sale, declaring null and void a note executed by Cathy Lewis[1] and secured by the property, dismissing American's constitutional takings claims against the taxing authorities involved in the foreclosure sale, and awarding attorney's fees to Pirkle. We modify the trial court's judgment and affirm the judgment as modified.

## II. Factual History

On October 20, 2003, Lewis executed a note and deed of trust in favor of Available Mortgage Funding, LLC (AMF) secured by property located at 5700 Calloway Street, Fort Worth. The deed of trust was filed of record ten days later, perfecting AMF's security interest in the property. *See* Tex. Prop. Code Ann. §§ 13.001–.002 (West 2014).

In 2009, the note and deed of trust were assigned to Stewardship Fund No. 3, LP (SF3) by Mortgage Electronic Registration Systems, Inc. (MERS), acting solely as nominee for AMF. This assignment was filed of record shortly thereafter.

One year later, on August 27, 2010, Appellees Tarrant County, the Tarrant County Hospital District, the City of Sansom Park, and the Tarrant County Community College District (collectively, the taxing authorities) filed a delinquent-property-tax suit. In that suit, the taxing authorities named only Lewis and MERS as defendants. SF3, the lienholder of record at the time the delinquent-tax suit

---

[1]Cathy Lewis is not a party to this appeal.

was filed, was not named as a defendant, nor was SF3 ever made a party to the lawsuit.[2]

On April 26, 2012, the trial court entered judgment against Lewis and MERS, authorizing the sale of the property to satisfy the tax liens. At the subsequent tax-foreclosure sale, which occurred on August 7, 2012, Pirkle purchased the property. The constable's deed, which acknowledged the tax sale and purported to convey free and clear title to Pirkle, was recorded on August 27, 2012. *See* Tex. Tax Code Ann. § 34.01(m) (West 2015).

Two months after the deed was recorded, on October 31, 2012, SF3 assigned all of its rights, title, and interest in the property to American. American contends that it took the assignment without notice of the tax suit or the tax sale, even though the constable's deed had been on file in the deed records for 65 days prior to the assignment and the tax suit had been on file for 2 years and 65 days prior to the assignment.

Pirkle was first introduced to American by a letter from American's counsel dated January 15, 2013, the same day that American filed its assignment from SF3 in the deed records of Tarrant County. This letter notified Pirkle that SF3's note and deed of trust had been assigned to American and that American now claimed a lien against Pirkle's property, a lien that American believed survived

---

[2]It is undisputed that SF3 did not receive actual notice of the lawsuit or the tax sale.

the tax sale because the taxing authorities had failed to join SF3 as a party to the tax suit.

### III. Procedural History

On February 15, 2013, American sent a notice of default to Lewis describing Lewis's default under the terms of the note, notifying Lewis that American had accelerated the note, and demanding payment of the entire balance due on the note.[3] After Lewis failed to pay as demanded, American prepared for a nonjudicial foreclosure of its interest in the property and posted the property for foreclosure sale to occur on Tuesday, April 2, 2013. *See* Tex. Prop. Code Ann. § 51.002 (West 2014).

The day before the foreclosure sale, Pirkle filed a lawsuit seeking a temporary restraining order (TRO) and temporary injunction to stay the foreclosure proceedings. The trial court granted the TRO, and 14 days later, it signed a temporary injunction enjoining American from proceeding with the nonjudicial foreclosure sale on the property.

On May 2, 2013, American answered the lawsuit and asserted a counterclaim for judicial foreclosure of its security interest. Within a month, both sides had filed competing summary judgment motions, which were heard on August 29, 2013. On September 30, the trial court signed an order granting partial summary judgment in favor of Pirkle, denying American's summary

---

[3]American claimed Lewis owed $99,901.71 on the note.

4

judgment motion, and declaring that: (1) the constable's deed conveying title to Pirkle was a valid deed; (2) American's rights under the deed of trust were extinguished by the tax sale; (3) American's rights under the note were extinguished by the tax sale; and (4) American's claim or lien on the property was extinguished and otherwise null and void.

The September 30 summary judgment remained interlocutory because it did not dispose of Pirkle's claim for attorney's fees, and on January 31, 2014, the trial court signed an order permitting American to file a third-party petition against the taxing authorities. *See* Tex. R. Civ. P. 38(a). American's third-party petition, filed on March 7, 2014, added the taxing authorities[4] to the lawsuit as third-party defendants, suing for damages for an unconstitutional taking of the property under article I of the Texas Constitution and for an "invalidation of the [t]ax [s]uit [j]udgment and subsequent [t]ax [s]ale" under Texas Government Code chapter 2007.

On June 26, 2014, the trial court granted the taxing authorities' plea to the jurisdiction. The final judgment in this case was signed on August 14, 2014, incorporating and merging the interlocutory orders into the final judgment and awarding to Pirkle attorney's fees in the amount of $35,000.

---

[4]American also named Castleberry Independent School District, which had intervened in the original tax-delinquency suit as a third-party defendant prior to the judgment and tax sale. Castleberry was subsequently nonsuited and is not a party to this appeal. *See* Tex. R. Civ. P. 162.

## IV. Discussion

American brings three issues on appeal.  In its first issue, American challenges the trial court's rulings on the competing summary judgment motions.  In its second issue, American alternatively complains that if the trial court correctly granted Pirkle's motion, then the taxing authorities are liable for an unconstitutional taking of its extinguished lienholder's rights.  And in its third issue, American contends that the trial court erred by awarding attorney's fees to Pirkle when no evidence was presented on the segregation of attorney's fees between the various parties involved and causes of action asserted.

### A.  Pirkle's Summary Judgment

In its first issue, American challenges the trial court's summary judgment rulings on the basis that the trial court "effectively rul[ed] that a tax foreclosure sale extinguishes an existing lien against real property despite the fact that the lienholder of record was not a party to, nor provided notice of, the underlying delinquent tax lawsuit," and that American established as a matter of law its entitlement to judicial foreclosure.  American also argues that the trial court erred by granting declaratory relief on the underlying note.[5]

---

[5]American further argues that Pirkle failed to submit competent summary judgment evidence and that the trial court erred by overruling American's objections to the summary judgment evidence that Pirkle did submit, but based on our resolution below, we do not reach this sub-issue.  *See* Tex. R. App. P. 47.1.  We do note, however, that the trial court had before it competing motions for summary judgment filed by both parties on a pure question of law, that neither side contends that a fact issue precluded the granting of summary judgment, and that all of the facts necessary to decide the legal issue before this court are

6

## 1. Summary Judgment on the Lewis Note

Because the note represented Lewis's promise to pay the lender and any assignees of the note the amounts due and because Pirkle had no interest under the note, American argues that no justiciable controversy existed between Pirkle and American with respect to the Lewis note. Therefore, American argues, the trial court erred by declaring that the note was "null and void and has no force and effect." American is correct.

Under the Uniform Declaratory Judgments Act, "[a] court of record within its jurisdiction has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Tex. Civ. Prac. & Rem. Code Ann. § 37.003(a) (West 2015). However, a declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties. *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995). Because Lewis was not a party to this suit, and Pirkle had no interest with regard to the note, there was no justiciable controversy between Pirkle and American regarding the validity of Lewis's note. *See id.* Therefore, the trial court's

---

undisputed by both American and Pirkle and included in their briefs on appeal. *See* Tex. R. App. P. 38.1(g) (stating that in civil cases, "the court will accept as true the facts stated unless another party contradicts them"). We also note that because both motions were properly before the court at the time summary judgment was granted on Pirkle's motion, all of the evidence accompanying American's summary judgment motion could have been considered by the trial court in deciding Pirkle's motion, and vice versa. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000); *DeBord v. Muller*, 446 S.W.2d 299, 301 (Tex. 1969).

declaration regarding the validity of the Lewis note was improper under these circumstances, and we sustain this part of American's first issue.

## 2. Effect of the Tax Foreclosure Sale on SF3's and American's Lien

American argues that, pursuant to rule of civil procedure 39, SF3 was a necessary and indispensable party to the delinquent tax suit, and because SF3 was not joined as a party to the lawsuit, American was therefore not bound by the judgment or tax sale that followed. According to American, Pirkle purchased the property at the tax sale subject to SF3's lien. Then when SF3 assigned all of its rights, title, and interest to the property to American three months later, American stood in the shoes of SF3 with full authority to enforce and foreclose upon the lien on Pirkle's property.

Pirkle frames the issue differently. Notwithstanding the fact that SF3 was neither aware of nor made a party to the underlying delinquent-tax lawsuit, Pirkle contends that because the property was acquired at a tax sale, his ownership interest came with certain statutory protections. American learned of Pirkle's ownership interest and the circumstances under which he had acquired the property within at least six months of the recording of Pirkle's deed.[6] Pirkle contends that once American became aware of the tax sale, it was incumbent upon American to comply with the requirements of the tax code in order to challenge Pirkle's claim. Instead, American chose to proceed with foreclosure,

_____

[6]On January 15, 2013, American sent its first letter to Pirkle in which it discussed the tax sale.

8

notwithstanding the tax code's provisions. Pirkle argues that American's refusal to follow the statutory scheme regarding tax-sale challenges barred any recovery against Pirkle by American and, pursuant to section 33.54 of the tax code, on August 28, 2013, Pirkle owned the property free and clear of American's purported lien.

### a. Tax Code Provisions

The tax code provides a statutory framework through which a challenge to a tax sale may be instituted against a purchaser at the sale. Section 34.08, "Challenge to Validity of Tax Sale," provides:

> (a) A person may not commence an action that challenges the validity of a tax sale under this chapter unless the person:
>
> > (1) deposits into the registry of the court an amount equal to the amount of the delinquent taxes, penalties, and interest specified in the judgment of foreclosure obtained against the property plus all costs of the tax sale; . . .
> >
> > . . . .
>
> (b) A person may not commence an action challenging the validity of a tax sale after the time set forth in Section 33.54(a)(1) . . . against a subsequent purchaser for value who acquired the property in reliance on the tax sale. *The purchaser may conclusively presume that the tax sale was valid and shall have full title to the property free and clear of the right, title, and interest of any person that arose before the tax sale . . . .*

Tex. Tax Code Ann. § 34.08 (West 2015) (emphasis added). Tax code section 33.54, "Limitation on Actions Relating to Property Sold for Taxes," further provides:

9

(a) Except as provided by Subsection (b), an action relating to the title to property may not be maintained against the purchaser of the property at a tax sale unless the action commenced:

(1) before the first anniversary of the date that the deed executed to the purchaser at the tax sale is filed of record; . . .

. . . .

(c) *When actions are barred by this section, the purchaser at the tax sale . . . has full title to the property, precluding all other claims.*

Tex. Tax Code Ann. § 33.54 (West 2015) (emphasis added).

Pursuant to these statutes, in order to challenge the validity of the tax sale or Pirkle's right to the property free and clear of liens, American was required to: (1) commence an action against Pirkle no later than August 27, 2013, the one-year anniversary of the tax-sale-deed recordation and (2) prior to commencing the action, make a deposit into the registry of the court in an amount equal to the amount of the delinquent taxes, penalties, and interest, plus all costs of the tax sale. *See id.* §§ 33.54(a)(1), 34.08(a)(1). Pirkle argues that American was required to do both, and American admits that it did neither.[7] Therefore, unless American was not subject to the statutory requirements for challenging a tax sale or a tax-sale purchaser's title, by the one-year anniversary of the recording of the sale—August 28, 2013—Pirkle could have conclusively presumed that the tax

---

[7]American argues that it "never filed suit to set aside the judgment rendered in the underlying tax suit . . . because it was not required to do so in order to protect and enforce its rights in the Property." It further argues, "More importantly, [American] was not subject to the 'prerequisites' imposed by Tax Code §34.08 and is not barred thereby from taking legal action to enforce its rights in the Property."

sale was valid and that he was vested with full title to the property free and clear of American's purported lien. *See id.* § 34.08(b).

To support its assertion that it was not required to comply with the mandates of the tax code, American relies primarily on *Security State Bank & Trust v. Bexar County*. 397 S.W.3d 715, 722 (Tex. App.—San Antonio 2012, pet. denied) (op. on reh'g). In *Security State Bank*, the bank—a lienholder of record at the time the tax suit and sale occurred that had not received notice of, nor been made a party to, the delinquent tax lawsuit—brought a lawsuit challenging the tax sale. *Id.* at 717–18. The bank's challenge did not comply with the tax code in two respects: (1) the lawsuit was filed four days after the one-year limitations period had run and (2) the deposit was not filed prior to, but rather 55 days after, the bank's lawsuit had been filed. *Id.* at 720–21. Nevertheless, after considering the bank's due-process arguments, the court held that the bank's challenge was proper, independent of the tax code, and that the tax judgment and tax sale were void as to the bank. *Id.* at 724. In so holding, the court drew a distinction between the facts of its case and the line of cases that have held that regardless of the merits of a tax sale challenge, the challenger must bring its suit within the tax code's limitations period and make the required deposit prior to filing the suit. *Id.* ("These cases are distinguishable, however, because none involved a record lienholder with a prior lien against the property.").

The distinction between a purported owner and a record lienholder becomes significant in the context of tax-sale challenges because of the

11

application of the tax code's tolling provision as to limitations. The tax code provides that the one-year limitation for challenging a tax sale can be tolled by a party who continues to pay taxes on the property up until the party's challenge is made.[8] As upheld by our sister court, the requirement that a *property owner* challenge the tax sale within the one-year time limit or, in the alternative, continue to pay property taxes, which tolls limitations, is not unreasonable. *W.L. Pickens Grandchildren's Joint Venture v. DOH Oil Co.*, 281 S.W.3d 116, 121 (Tex. App.—El Paso 2008, pet. denied). After all, even if a property owner is unaware of the foreclosure, he or she should continue to pay property taxes. *Id.* This explains why—regardless of whether he or she is named and served with citation in a tax suit—the tax code does not work to deny an *owner* the opportunity to challenge the tax sale. *See id.*; *see also John K. Harrison Holdings, LLC v. Strauss*, 221 S.W.3d 785, 789 (Tex. App.—Beaumont 2007, pet. denied) ("It is reasonable to expect one claiming an ownership in property to pay the taxes on the property to avoid the limitations bar.").

---

[8]Tax code section 33.54(b) provides,

> If a person other than the purchaser at the tax sale . . . pays taxes on the property during the applicable limitations period and until the commencement of an action challenging the validity of the tax sale and that person was not served citation in the suit to foreclose the tax lien, [the] limitations period does not apply to that person.

Tex. Tax Code Ann. § 33.54(b).

This rationale does not necessarily hold true for lienholders, however. A lienholder, who is not ordinarily liable for payment of taxes on the property, would not be in the same position as an owner who, perhaps unwittingly, tolls the limitations period simply by carrying on in the normal course through the payment of property taxes as they become due. In recognition of this distinction, the court in *Security State Bank* rejected the notion that the bank in that case, which was a lienholder "at the time the delinquent tax suit was filed" rather than a property owner, was precluded from collaterally attacking the tax sale, independent of the tax code provisions. 397 S.W.3d at 721–25. Under the facts of *Security State Bank* and the cases *Security State Bank* cites in support of its holding, the lienholder received no notice of the lawsuit and had no opportunity to toll limitations through payment of property taxes. *Id.* The facts of our case are quite different.

Unlike the lienholder in *Security State Bank*—which had an existing lien against the property at the time the delinquent tax suit was filed and when the sale occurred and was deprived of notice of these events—American acquired its lien on the property with full notice of the delinquent tax lawsuit, the judgment resulting from the lawsuit that authorized the tax sale, and the resulting tax sale itself. As of October 31, 2012, the date American received its assignment from SF3, the constable's deed had been on file in the deed records for 65 days, the judgment ordering the tax sale had been on file for 188 days, and the tax suit had

13

been on file for 2 years and 65 days prior to the assignment.[9]  The holding in *Security State Bank* is therefore distinguishable on its facts.

In this case, well within the limitations period and armed with actual knowledge of Pirkle's purchase of the property at the tax sale and at least general awareness of the existence of the Texas Tax Code,[10] American made a conscious decision not to comply with the statutory framework created by the Texas Legislature to be followed in these very circumstances.  American chose not to make the required statutory deposit.  American chose not to file suit within the statutory limitations period or, in the alternative—even if it was already engaged in litigation with Pirkle—to toll limitations through the interim payment of property taxes.  Instead, from the outset, American held steadfast to its position that it was exempt from the law.

To support its position, American claims status in the underlying lawsuit as a necessary party under rule of civil procedure 39.  Rule 39, "Joinder of Persons Needed for Just Adjudication," requires service and joinder of persons whose

---

[9]The property code provides that an "instrument that is properly recorded in the proper county . . . is notice to all persons of the existence of the instrument."  Tex. Prop. Code Ann. § 13.002(1); *Aston Meadows, Ltd. v. Devon Energy Prod. Co.*, 359 S.W.3d 856, 859 (Tex. App.—Fort Worth 2012, pet. denied).  Once the constable's deed was properly filed in the deed records of Tarrant County, an irrebuttable presumption of notice arose as to Pirkle's ownership of the property free and clear of all liens.  *Aston Meadows*, 359 S.W.3d at 859; *see also Ford v. Exxon Mobil Chem. Co.*, 235 S.W.3d 615, 617 (Tex. 2007).

[10]American references the tax code in its January 15, 2013 demand letter to Pirkle.

interests would be affected by a judgment. Tex. R. Civ. P. 39(a). When a person claims an interest relating to the subject matter of an action, and "is so situated that the disposition of the action in his absence may . . . as a practical matter impair or impede his ability to protect that interest," rule 39 compels his joinder in the action. *Security State Bank*, 397 S.W.3d at 722 (quoting Tex. R. Civ. P. 39)*; see also Brooks v. Northglen Ass'n,* 141 S.W.3d 158, 162 (Tex. 2004) ("Rule 39(a)(1) requires the presence of all persons who have an interest in the litigation so that any relief awarded will effectively and completely adjudicate the dispute.").

In the context of delinquent-tax suits, Texas courts have generally held that because a record lienholder possesses a significant interest in the property subject to foreclosure, a lienholder is a necessary party who must be joined in the suit to be bound by it. *Security State Bank*, 397 S.W.3d at 722; *Mem'l Park Med. Ctr., Inc. v. River Bend Dev. Grp., L.P.,* 264 S.W.3d 810, 814 (Tex. App.—Eastland 2008, no pet.); *Jordan v. Bustamante,* 158 S.W.3d 29, 38–39 (Tex. App.—Houston [14th Dist.] 2005, pet. denied); *Murphee Prop. Holdings, Ltd. v. Sunbelt Sav. Ass'n of Tex.,* 817 S.W.2d 850, 852–53 (Tex. App.—Houston [1st Dist.] 1991, no writ). These courts have further held that the absence of the lienholder from the tax suit will render the tax sale invalid as to the lienholder. *Security State Bank*, 397 S.W.3d at 722–24. At the time of the lawsuit and subsequent tax sale, American had no interest in the property that would be affected by the judgment.

15

It is undisputed that SF3 was the record lienholder on the property at the time of the tax sale.  As such, SF3 should have been joined in the lawsuit as a party and afforded an opportunity to protect its property interest.  *See id.* at 721–22.  Because it was not joined in the delinquent tax lawsuit, SF3 was not legally bound by the judgment or the tax sale.  *See id.* at 724.  Following *Security State Bank*, SF3 could have side-stepped the mandates of the tax code and collaterally attacked the tax judgment to set aside both the judgment and tax sale as to its lien interest.  *See id.* at 724–25.

But SF3 did not do this.  Instead, three months after the tax sale, SF3 assigned its lien to American, which, as discussed above, purchased the assignment with an irrebuttable presumption of notice of the intervening tax sale.  *See Ford*, 235 S.W.3d at 617; *Aston Meadows*, 359 S.W.3d at 859.  Since American was not a record lienholder and had no ownership interest in the property at the time of the tax judgment and tax sale, American possessed no due-process rights to notice or service of the delinquent-tax lawsuit or the subsequent sale.  American was afforded its own due process rights as a subsequent purchaser of SF3's interest in the property when it purchased the assignment with notice of the intervening tax sale.  Whether American, as SF3's successor in interest, could likewise disregard the tax code depends wholly upon whether American has standing to assert SF3's right to due process.

### b. Due Process

Generally speaking, a party has no standing to set aside a tax sale based upon the failure to join other necessary or indispensable parties in the delinquent-tax lawsuit. *Jordan*, 158 S.W.3d at 39 (citing *Sweed v. City of El Paso,* No. 08-00-00195-CV, 2001 WL 1469071, at *2 (Tex. App.—El Paso Nov. 20, 2001, pet. denied) (not designated for publication) (holding failure to join all interested parties in delinquent-tax suit did not deprive trial court of power to render valid judgment against those actually named, and appellant had no standing to assert any rights on behalf of third party)); *see also Murmur Corp. v. Bd. of Adjustment,* 718 S.W.2d 790, 793 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) (holding subsequent purchaser of property had no standing to complain of lack of notice to former owner). American argues that it has standing because, as SF3's assignee, American "effectively stands in the shoes of SF3" to assert its claims against the taxing authorities.

Whether American's presumption is correct, however, is not so clear. Assuming without holding that the assignment purported to convey the right to sue generally, whether a lienholder's right to challenge a tax judgment and sale based upon due-process violations is assignable at all appears to be an issue of first impression in Texas.

It is axiomatic that an assignee stands in the shoes of its predecessor in interest, and, at first blush, this general principle should end the inquiry. Indeed, in its brief, American reaches this conclusion in one sentence, with no scrutiny of

17

the basis for that conclusion. In fact, the entire premise regarding standing to sue for another's due-process violations is glossed over by American without a single citation to authority and simply a recitation that SF3 "assigned, granted, transferred and conveyed all of SF3's rights, title and interest in the Note and Deed of Trust to [American]."

We start with the general rule that causes of action are freely assignable in Texas. *City of Brownsville ex rel. Pub. Utils. Bd. v. AEP Tex. Cent. Co.,* 348 S.W.3d 348, 358 (Tex. App.—Dallas 2011, pet. denied). However, exceptions have been carved out of this general rule, mostly in situations when "the particular assignment presents specific dangers, such as jury confusion, the multiplication of disputes, and potential prejudice to the parties." *HSBC Bank USA, N.A. v. Watson*, 377 S.W.3d 766, 774 (Tex. App.—Dallas 2012, pet. dism'd) (citing *State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696, 707–11 (Tex. 1996)).

Although not a delinquent-tax suit, the facts of *HSBC* are somewhat similar and its analysis is instructive to this case. *See id.* at 770–71, 774–75. *HSBC* involved an attempt to set aside a default judgment that voided a lien and deed of trust on the grounds that the prior lienholder had not been served or made a party to the underlying lawsuit. *Id.* at 770. Like American, the appellant in *HSBC* had no then-existing right or interest at the time of the judgment. *Id.* HSBC, who took the lien by assignment postjudgment, brought a bill of review and asserted standing to challenge the judgment by asserting a violation of the prior

18

lienholder's due-process rights, just as American does in this case. *Id.* at 770–71, 773–74. And in *HSBC*, as in this case, the appellees argued that only the party whose due-process rights were violated had standing to assert those rights. *Id.* at 774.

In permitting the subsequent lienholder to pursue the bill of review, the court held that, in the absence of policy reasons forbidding the particular assignment, the policy of the state would be to permit it. *Id.* at 775. Because the assignment to HSBC was not "inimical to public policy," the court allowed HSBC to step into the shoes of its predecessor in interest and pursue its predecessor's due-process-violation claim. *Id.*

We agree with the analysis of *HSBC*, and the question now becomes—is there a public policy reason to forbid the due-process claim assignment in this particular case? We believe there is.

As the supreme court explained in *Gandy*, a deceptive-trade-practices-act (DTPA) case, the question of assignability of causes of action has its roots in equity, not law. 925 S.W.2d at 705–15. At early common law, a cause of action could not be assigned. *Id.* at 705–06. This common law rule against assignability was believed to be rooted in two equitable principles. *Id.* at 706. First, the bar served as a guard against the proliferation of lawsuits and unethical practices, and, second, common law regarded rights as personal to the holder, considering the individuals and circumstances involved, such that rights and

19

obligations could not be enforced apart from their context without risking distortion. *Id.*

The supreme court further explained that as early as the fifteenth century, this common law bar began to give way to the demands of commerce that assigned debts should be enforceable, and by the eighteenth century, it had collapsed with regard to debts and contract rights. *Id.* The only remnants of the common law bar against assignability of causes of action that survived in American common law were those pertaining to some torts, and by 1895, even personal-injury claims became assignable in Texas. *Id.* at 706–07 (citing *Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 22 (Tex. 1987)). The supreme court explained that while "practicalities of the modern world" have now made the assignability of causes of action the general rule, the "common law's reservations to alienability" have not been entirely dispelled, nor has the "role of equity or policy" been displaced in shaping the rule, such that even today, contractual assignments may be "inoperative on grounds of public policy." *Id.* at 707.

The court outlined four instances in which it has held the assignment of a cause of action invalid, each of which was based on equitable principles and "historical reservations." *Id.* These four instances are (1) the assignment of legal malpractice claims, as "demean[ing to] the legal profession," *Zuniga v. Groce, Locke & Hebdon,* 878 S.W.2d 313, 314, 317–18 (Tex. App.—San Antonio 1994, writ ref'd); (2) the assignment to settling defendants of a part of a plaintiff's claim against nonsettling defendants—"Mary Carter" agreements—as void against

20

public policy due to the tendency to promote litigation rather than settle it and the distorting effect such agreements have on the rights of nonsettling defendants, *Elbaor v. Smith,* 845 S.W.2d 240, 242, 246–50 (Tex. 1992); (3) the assignment to one tortfeasor of rights to prosecute against a joint tortfeasor as unenforceable due to its tendency to confuse the jury and prejudice the rights of the remaining parties, *Int'l Proteins Corp. v. Ralston–Purina Co.,* 744 S.W.2d 932, 933–34 (Tex. 1988); and (4) the particular assignment of an interest in an estate, due to its distorting effect at trial and its effect of depriving other parties of their rights, *Trevino v. Turcotte,* 564 S.W.2d 682, 684–88 (Tex. 1978). *Id.* at 707–11.

> The court then turned to the facts of *Gandy*, stating,

> The common law's concerns about alienability of choses in action, voiced by Lord Coke and Holmes, echo in our own decisions. In widely different contexts we have invalidated assignments of choses in action that tend to increase and distort litigation. We have never upheld assignments in the face of those concerns. With these things in mind, we turn to the assignment in this case, and others like it.

*Id.* at 711. After considering the facts of the case before it and applying the equitable principles involved, the supreme court held invalid assignments of an insured's DTPA cause of action against its insurance company, citing, among other reasons, that the point of the assignment would not end litigation but rather prolong it. *Id.* at 712–14.

Both *Gandy* and *HSBC* stand for the proposition that, in the face of a challenge as to standing to assert a due-process claim that has been purportedly assigned to another, courts should inquire as to whether there are notions of

21

equity and public policy that would vitiate the assignment of the claim under the circumstances. Applying this standard, this court finds at least six equitable and public-policy reasons why American should not be permitted to stand in the shoes of SF3 to assert SF3's due process violations.

### (1.)    Equity Favors Diligence

The expectation that parties exercise diligence and vigilance in their own affairs is a deeply rooted principle of equity. *Rivercenter Assocs. v. Rivera*, 858 S.W.2d 366, 367 (Tex. 1993) (orig. proceeding) ("'Equity aids the diligent and not those who slumber on their rights.'") (quoting *Callahan v. Giles*, 155 S.W.2d 793, 795 (Tex. 1941)). This fundamental notion of equity would be violated by permitting a subsequent purchaser to ignore the deed records that would put him on notice of the purported extinguishment of the property rights he seeks to acquire and then to collaterally attack the very deed that would have provided notice in advance of the acquisition. Instead, it would reward indolence and neglect.

On more than one occasion, the supreme court has pointed out that the fundamental purpose of recording laws is to protect parties such as American from this very circumstance. *Ojeda de Toca v. Wise*, 748 S.W.2d 449, 450–51 (Tex. 1988) ("We conclude instead that the purpose of recording statutes is to protect 'intending purchasers and encumbrancers . . . against the evils of secret grants and secret liens . . . .'") (citing 66 Am. Jur. 2d *Records and Recording Laws* § 48 (1973)). The court in *Ojeda* explained that to protect American—and

22

others like it—"the Texas Legislature enacted a comprehensive statutory recording system which provides in part that '[a]n instrument . . . properly recorded in the proper county is notice to all persons of the existence of the instrument.'" *Id.* at 451 (citing Tex. Prop. Code Ann. § 13.002).[11]

As one commentator has observed, "The central purpose of law is to guide behavior. When legislatures create rules, a person properly forms expectations about how the legal system will respond to his actions." Stephen R. Munzer, *A Theory of Retroactive Legislation,* 61 Tex. L. Rev. 425, 426 (1982). In this circumstance, where American, through the exercise of diligence, would have discovered Pirkle's claim prior to taking the assignment from SF3, it would be violative of both public policy, as expressed by both the property code and the tax code, and principles of equity to allow American nevertheless to bypass the statutory scheme available to challenge the tax sale. Applying the standards of *Gandy* and *HSBC*, the equitable principle favoring due diligence, combined with a comprehensive statutory system for recording real-property records, weigh

_____

[11]The court further explained that while the deed record provided notice to a subsequent purchaser, failure to search the deed records prior to purchase would not operate as a bar against a fraud action against the seller. *Ojeda*, 748 S.W.2d at 451. So, for example, here, American's failure to search the deed records would not have precluded an action by it against SF3. *See id.* But if American had pursued an action against SF3, limitations on that action would have begun to run immediately because, as the supreme court has held, even when a party fails to examine the public record, he still is on notice of the deed records contained therein for the purposes of limitations. *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 887 (Tex. 1998).

against permitting the assignment of SF3's due-process claim to American under these circumstances.

### (2.) Public Policy Favors Limitations

In this case, American seeks to collaterally attack the effects of a tax sale rather than utilize the statutory remedy that was available to it but that also carried with it a limitations period. *See* Tex. Tax Code Ann. §§ 33.54, 34.08. As the court in *Security State Bank* pointed out, a collateral attack may be brought at any time, and it is not limited to a definite time period after the tax judgment has been rendered or the sale has occurred. 397 S.W.3d at 723. But allowing a lienholder who acquired its interest with notice of the tax judgment and sale to collaterally attack the tax judgment at any time in the future, unfettered by any applicable limitations period, would serve to undermine the public policy in favor of imposing limitations on causes of action. *Cf. id.*

Texas law favors limitations of actions. *See Strauss*, 221 S.W.3d at 789 ("Statutes of limitations serve to further the policy that one must diligently pursue legal rights at the risk of losing them if they are not timely asserted."). The supreme court has declared that "[i]t is in society's best interest . . . that disputes be settled or barred within a reasonable time." *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734 (Tex. 2001). In both law and law-making, limitations statutes are ubiquitous. *See, e.g.*, Tex. Bus. & Com. Code Ann. § 17.565 (West 2011); Tex. Civ. Prac. & Rem. Code Ann. §§ 16.002, 16.004–.005, .022–.028 (West 2002), §§ 16.003, .0045 (West Supp. 2014), §§ 16.051,

24

.061 (West 2015); Tex. Gov't Code Ann. § 2253.073 (West 2008); Tex. Ins. Code Ann. § 541.162 (West 2009); Tex. Loc. Gov't Code Ann. § 62.089 (West 2008); *Cosgrove v. Cade*, No. 14-0346, 2015 WL 3976719, at *2 (Tex. June 26, 2015) ("A four-year period also applies to deed-reformation claims."); *Am. Star Energy & Minerals Corp. v. Stowers*, 457 S.W.3d 427, 430 (Tex. 2015) (stating that when the legislature employs the term "accrued" without accompanying definition, "'the courts must determine when that cause of action accrues and thus when the statute of limitations commences to run'") (quoting *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex. 1990)).[12]

Nor has limitations escaped the context of tax sales. The Texas Legislature considered limitations to be sufficiently important in the context of finality of tax sales to provide for a one-year limitations period in which to levy any challenge. *See* Tex. Tax Code Ann. § 33.54(a). Further recognizing that this one-year limitations period might work an injustice to parties who did not receive actual notice of the delinquent tax lawsuit or sale, the legislature also expressly provided for the tolling of limitations for parties so situated. *See id.*

---

[12]We cite these merely for example. There are many, many more. Indeed, a search on the Texas Legislature's website using "limitations" as the keyword (in addition to "statute" as a secondary key word and "statute of limitations" as the exact phrase being sought) showed that for more than two decades, not a single regular legislative session has passed without consideration of proposed legislation relating to limitations in some form or manner. *See* Texas Legislature Online, *Text Search*, *available at* http://www.legis.state.tx.us/Search/TextSearch.aspx (last visited August 31, 2015).

§ 33.54(b).[13]  Despite the fact that American was aware of the tax sale well within the limitations period and had the ability to toll the period even further, American instead deliberately chose to disregard the limitations deadline.

The undisputed evidence in this case establishes that no later than January 15, 2013, American was aware of the August 27, 2012 tax sale.  By that time, American was still within the applicable limitations period to file suit against Pirkle.  *See* Tex. Tax Code Ann. §§ 33.54(a)(1), 34.08(b).  At that point in time, American had more than seven months to decide whether to pay the deposit and file the challenge, or to pay the property taxes and toll the limitations period

[13]Prior to September 1, 1997, the tax code provided a three-year limitations period to bring a tax sale challenge.  *See* Act of May 24, 1979, 66th Leg., R.S., ch. 841, § 1, sec. 33.54(a), 1979 Tex. Gen. Laws 2296, 2296, 2332 (amended 1997) (current version at Tex. Tax Code Ann. § 33.54 (West 2015)).  The 75th Legislature shortened that period of time to one year and retained the tolling provision for those who were not served with citation in the foreclosure suit, but added the provision that prohibits a person from challenging the validity of a tax sale unless he or she deposits a certain amount into the registry of the court or files an affidavit of inability to pay.  *Compare id.*, *with* Act of May 22, 1997, 75th Leg., R.S., ch. 1136, § 1, sec. 33.54(a), § 4, sec. 34.08(a), 1997 Tex. Gen. Laws 4299, 4299–302 (current version at Tex. Tax Code Ann. §§ 33.54, 34.08).  The bill analysis explained the public-policy reason for shortening the limitations period from three years to one, stating:

> Currently . . . the Property Tax Code provides a three-year period following the tax sale in which the procedural methodology of the foreclosure can be contested. . . .  The potential of such a claim can effectively forestall redevelopment of the property until the three-year limitations period elapses, causing abandoned properties to abound.  This legislation would shorten the limitations period to one year . . . .

Senate Comm. on Intergovernmental Relations, Bill Analysis, Tex. S.B. 1249, 75th Leg., R.S. (1997), *available at* http://www.capitol.state.tx.us/tlodocs/75R/analysis/html/SB01249S.htm.

26

indefinitely. *See id.* §§ 33.54(b), 34.08(a)(1). The parties were cast as adversaries in litigation seventy-five days later—when Pirkle filed suit against American on April 1, 2013—and still American had almost six months left of the one-year limitations period to make a decision on whether to challenge the tax suit or to pay the property taxes, thereby extending the limitations period even further. *See id.*

In this circumstance, where American had more than ample opportunity to comply with the tax code and challenge the tax sale during the applicable period of limitations—or to take the necessary action to toll the applicable limitations period altogether—it would be contrary to public policy to permit American to ignore the applicable statutes governing tax sale challenges and, instead, to insist that it be allowed to collaterally attack the tax sale at whatever juncture, on whatever timeframe,[14] it fancied. Applying the standards of *Gandy* and *HSBC*, the strong public policy in Texas that favors the imposition of limitations on the commencement of actions—specifically, limitations on actions challenging delinquent-property-tax sales—balances against permitting the assignment of SF3's due-process claim to American under these circumstances.

---

[14]The legislature has evidenced a strong desire that the statutory scheme of requiring a deposit be made prior to asserting a challenge to the tax sale be followed. As explained in the analysis of the 1997 amendments to the tax code, "Finally, this bill seeks to forestall frivolous claims of faulty process by requiring all taxes, penalties, interest, and costs on the property to be deposited into the registry of the court at the time such a claim is made . . . ." Senate Comm. on Intergovernmental Relations, Bill Analysis, Tex. S.B. 1249, 75th Leg., R.S. (1997), *available at* http://www.capitol.state.tx.us/tlodocs/75R/analysis/html/SB01249S.htm.

### (3.) Public Policy Favors Free and Clear Title

Equally evident from the tax code provisions is the public policy that favors the conveyance of free and clear title to purchasers at tax sales.[15]

As the supreme court has repeatedly emphasized, "[t]he plain language of a statute is the surest guide to the Legislature's intent." *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 507 (Tex. 2012); *see also Greater Houston P'ship v. Paxton*, No. 13-0745, 2015 WL 3978138, at *5 (Tex. June 26, 2015) ("We seek that [legislative] intent first and foremost in the plain meaning of the text."); *Valdez v. Hollenbeck*, No. 13-0709, 2015 WL 3640887, at *8 (Tex. June 12, 2015) ("Our plain-language reading of section 31 is reinforced when the statute is viewed within the context of the Probate Code."); *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) ("Our objective in construing a statute is to give effect to the Legislature's intent, which requires us to first look to the statute's plain language.").

The current tax code is replete with affirmations that the purchaser at tax sales should take the property free and clear of all liens. *See* Tex. Tax Code Ann. § 33.54(c) ("When actions are barred by this section, the purchaser at the tax sale . . . has full title to the property, precluding all other claims."), § 34.08(b)

---

[15]The need for "stability and certainty" in title to real estate is also a central purpose of imputing constructive notice through the statutory recording scheme discussed above. *HECI*, 982 S.W.2d at 887. Thus, through both the tax code and the property code, the public policy in favor of effectuating clean title transfers by availing oneself of the statutory mechanisms in place is manifest.

(stating that when limitations has run under section 33.54(a)(1) or (2), the purchaser "may conclusively presume that the tax sale was valid and shall have full title to the property free and clear of the right, title, and interest of any person that arose before the tax sale, subject only to recorded restrictive covenants and valid easements of record," per section 34.01(n), "and subject to applicable rights of redemption"), § 34.01(n) (West 2015) ("[T]he [constable's] deed vests good and perfect title in the purchaser or the purchaser's assigns" subject to a few exceptions not applicable here).[16]

The public policy underlying this legislative scheme, and all other jurisdictions with similar delinquent-property-tax-sale statutes, is to encourage tax sale purchases.[17]  *See* Frank S. Alexander, *Tax Liens, Tax Sales, and Due*

---

[16]Changes to the tax code in 1997 made even more evident legislative intent that tax purchasers take free and clear title, subject only to challenges within the statutory framework that the legislature devised.  The legislature amended section 33.54(c)'s statutory language, which had provided that the purchaser "shall be held to have full title to the property, precluding all other claims," *see* Act of May 24, 1979, 66th Leg., R.S., ch. 841, sec. 33.54(c), 1979 Tex. Gen. Laws 2217, 2296 (amended 1997), to a more direct assertion that the purchaser "has full title to the property, precluding all other claims," *see* Act of May 28, 1997, 75th Leg., R.S., ch. 1192, § 1, sec. 33.54(c), 1997 Tex. Gen. Laws 4594, 4595, and added section 34.08(b), which provides that unless the limitations period and deposit requirements were complied with, "[s]uch purchaser may conclusively presume that the tax sale was valid and shall have full title to the property free and clear . . . ."  Act of May 28, 1997, 75th Leg., R.S., ch. 1192, § 3, sec. 34.08(b), 1997 Tex. Gen. Laws 4594, 4595–96 (amended nonsubstantively 1999).

[17]Tax sale purchases—through the transfer of good title—are encouraged because doing so "recovers more delinquent taxes, and should start a period of timely payment of future taxes."  21 Jay D. Howell Jr., *Texas Practice Series: Property Taxes* § 871 (4th ed. 2014).

*Process*, 75 Ind. L.J. 747, 763 (2000) (observing that a property-tax lien has "super-priority status"); Michael G. Pellegrino & Ralph P. Allocca, *Tax Certificates:  A Review of the Tax Sale Law*, 26 Seton Hall L. Rev. 1607, 1608 (1996) ("The public policy underlying the [New Jersey] Tax Sale Law is to encourage tax sale foreclosure in order to assist municipalities in collecting delinquent taxes."); *see also* Michelle Z. Marchiony, Comment, *Making Debt Pay: Examining the Use of Property Tax Delinquency as a Revenue Source*, 62 Emory L.J. 217, 223–24 (2012) (explaining that property tax liens enable tax enforcement in that the local government can foreclose upon them and compel transfer of the underlying property to allow recovery on the debt, extinguish the lien, and provide government services); Jennifer C.H. Francis, Comment, *Redeeming What is Lost:  The Need To Improve Notice for Elderly Homeowners Before and After Tax Sales*, 25 Geo. Mason U. Civ. Rts. L.J. 85, 90 (2014) (stating that "[e]very state has laws implementing tax lien systems that enable local governments to sell a homeowner's property for unpaid taxes"); Matthew J. Samsa, Note, *Reclaiming Abandoned Properties:  Using Public Nuisance Suits and Land Banks to Pursue Economic Redevelopment*, 56 Clev. St. L. Rev. 189, 191–93 (2008) (addressing real property abandonment to note that "[l]ocal governments currently use tax foreclosure and building and housing codes as the principal methods of abating nuisances").

It is a generally well-accepted principle that investors are risk averse. Henry N. Butler, *Economic Analysis for Lawyers* 11, 571 (2d ed. 1998)

30

(observing that "the concept of risk aversion is the basis for many important weights in economics, finance, and law" and that economists assume that most people are risk averse "concerning gambles that affect a significant proportion of their wealth"). The assessment of risk, though not readily quantifiable, is an appreciable consideration for those engaging in business transactions. *See* Mark Moller, *Procedure's Ambiguity*, 86 Ind. L.J. 645, 708 (2011) (distinguishing between the risk-averse, who avoid bets that present quantifiable odds of a terrible loss, and the uncertainty-averse, who avoid bets where the odds are unknown). One of the most critical determinants in the willingness of a private investor to purchase property at a tax sale is uncertainty. *See* Alexander, *supra*, at 763. Few title companies will insure title derived from a tax sale. *Id.* at 748. Because the risk of potential claims against property purchased at a tax sale might prevent or hinder prospective buyers from participating in tax sales, the Texas Legislature has reduced that risk by providing for full and clear title to those who purchase property at tax sales. *See* Tex. Tax Code Ann. §§ 33.54(c), 34.08(b). With greater certainty about the strength of the title they acquire, those who are risk-averse have more incentive to purchase property at tax sales.

Absent from the facts of this case is any compelling reason to allow an assignment of a cause of action that would only serve to create more litigation and uncertainty with regard to the effect of tax sales, especially when the legislature has expressed unambiguous intent that it wants tax-sale purchasers to take free and clear of all preexisting liens. *See id.*

31

To allow American to stand in the shoes of SF3 to assert SF3's due-process violations would further serve to thwart public policy and the intent of the Texas Legislature that unless a challenge is made within the limitations period and using the statutory framework that was promulgated for the purpose of warding against frivolous claims, tax-sale purchasers receive free and clear title to the property purchased. Thus, the well-established public policies in favor of stability and certainty of the purchaser's title at a delinquent-tax sale weigh against permitting the assignment of SF3's due-process claim to American under these circumstances.

### (4.) Public Policy Disfavors Promoting Litigation

Allowing American to pursue SF3's claim for due-process violations would also serve to promote litigation, rather than end it. In both *Elbaor* and *Gandy*, the supreme court held that an assignment of a cause of action that serves to promote litigation rather than end it violates public policy and should not be enforced. *Gandy*, 925 S.W.2d at 705–15; *Elbaor,* 845 S.W.2d at 250.

While SF3 could have asserted its due-process violations through a collateral attack on the judgment, it did not choose to do so. Instead, SF3 sold its interest to American, which took the interest with constructive notice of the recorded constable's deed that vested "good and perfect title" to the property in Pirkle, subject only to the provisions for challenge and redemption under tax code section 34.01(n). Allowing SF3's due-process violations to be litigated by American through collateral attack, notwithstanding limitations or any other

32

statutory restriction that would otherwise apply, would create not only a viable threat of litigation but also a threat that would last in perpetuity.

As Pirkle points out in his brief, permitting American to pursue SF3's due process violation claim risks "establish[ing] a dangerous precedent" by providing "an incentive to predators to peruse tax sale records for defects in notice to lienholders, acquire the lien at a discount, and then to foreclose on the lien without any protections to the property tax sale purchaser."[18]  We agree.  To permit the assignment of SF3's due-process claim in this circumstance would work to encourage litigation, rather than to curb it.

### (5.)   Collateral Attacks are Disfavored

Collateral attacks are disfavored because they run counter to the strong public policy of the law to give finality to judgments.  *H.E.B., L.L.C. v. Ardinger*, 369 S.W.3d 496, 521 (Tex. App.—Fort Worth 2012, no pet.) (citing *Browning v. Prostok*, 165 S.W.3d 336, 345 (Tex. 2005)).  Consequently, only a void judgment may be collaterally attacked.  *Browning*, 165 S.W.3d at 346.

While *Security State Bank* permitted a collateral attack on a tax suit judgment by a lienholder who did not receive notice of the lawsuit, we can find no

---

[18]This is not merely a theoretical concern.  In *Acirema, N.V. v. Lilly*, a lienholder took by transfer and assignment in 1996 all rights to property that had been sold at a tax sale in 1994.  No. CIV. A. 1:96–0559, 1997 WL 876738, at *1– 2 (S.D. W.Va. Aug. 11, 1997), *aff'd*, 141 F.3d 1157 (4th Cir. 1998).  The subsequent lienholder sought to have the tax deed set aside, asserting a due- process violation as to its predecessor in interest who had received no notice of the original, first attempt at a tax sale in 1989.  *Id.* at *4.  The court declined to reinstate the deed of trust, however, partly because the lienholder failed to avail itself of statutory remedies.  *Id.* at *4–5.

case where the right of collateral attack has been extended to subsequent lienholders, such as American, who took their interests with notice. The holding of *Security State Bank* was narrowly drawn, encompassing only the party whose due process rights were denied. *See* 397 S.W.3d at 724–25 (concluding that the bank's suit was a proper collateral attack based upon a due-process violation that rendered the tax judgment and tax sale void *as to it*; finding *the bank* was not bound by the judgment, but the judgment *valid to other parties*; holding that the bank was entitled to have the tax judgment set aside *as to its lien interest*; and setting aside the tax judgment and sale *as to the bank's interest*).

And while *Security State Bank* supports the proposition that the delinquent tax judgment in this case was void as to SF3, it does not support the contention that the judgment should be void as to American. *Cf. id.* American took its interest with constructive notice of the constable's deed at a time when it could have directly attacked the judgment. The strong public policy disfavoring collateral attacks on judgments therefore militates against permitting the assignment of SF3's due-process claim to American under these circumstances.

### (6.)   Considerations of Comity

Through an elaborate scheme that has been revisited and amended over the years, the Texas Legislature has clearly expressed a desire to resolve tax-sale challenges pursuant to statute, not collateral attack. *See* Tex. Tax Code Ann. §§ 33.54, 34.08. Unlike the parties involved in the cases that American

34

cites,[19] at no point in this series of circumstances was American ever deprived of a due process right, i.e., the opportunity to avail itself of statutory remedies to challenge the sale.[20]

When the legislature has exercised its authority to provide a statutory remedy that, if followed, would have fully addressed every due process concern

---

[19]In addition to *Security State Bank*, American also relies on *Kothari v. Oyervidez*, 373 S.W.3d 801, 810 (Tex. App.—Houston [1st Dist.] 2012, pet. denied), *First State Bank-Keene v. Metroplex Petroleum Inc.*, 155 F.3d 732, 737 (5th Cir. 1998), and *Murphee Property Holdings, Ltd. v. Sunbelt Savings Association of Texas*, 817 S.W.2d 850, 852 (Tex. App.—Houston [1st Dist.] 1991, no writ). All three cases are distinguishable, however, because the complaining parties in those cases were the actual lienholders at the time the tax-suit judgment was rendered. *First State Bank-Keene*, 155 F.3d at 733–34, 737 (holding that under Texas law, because the FDIC was not made a party to the tax suit, its lien interest was not disposed of and the tax sale purchasers took the property subject to that lien); *Kothari*, 373 S.W.3d at 802–04, 811 (reversing summary judgment because the summary judgment record did not address critical facts concerning notice and filing that were necessary for the court to determine as a matter of law whether the appellant was entitled to foreclose his liens on the property); *Murphee*, 817 S.W.2d at 851, 854 (affirming judgment for record lienholder who was not made a party to the tax suit).

[20]American is not asking this court to merely follow *Security State Bank* and the line of cases that, applying the principles of due process, carve out a tolling provision for lienholders who were not served with notice of the delinquent tax lawsuit. In those cases, had the courts not intervened and permitted a collateral attack on the tax-sale judgment, valuable due-process rights would have been denied to otherwise assiduous lienholders who held *existing* property rights. What American instead asks this court to do is take these cases one step further. American asks this court to carve out another exception for a special class of litigants—*subsequent* lienholders who take, with eyes wide open, assignments with constructive notice of the properly-recorded constable's deed, and, thereafter, armed with actual knowledge of the tax sale well within the applicable period of limitations, nevertheless proceed to turn a blind eye to the statutory mandates in place to assert a challenge to the tax sale in a proper and timely manner.

35

present in this circumstance, there is little justification for the courts to intervene to create new rights and remedies that would allow lienholders to side-step legislative mandates. The due-process analysis in *Acirema* is particularly instructive:

> Where the plaintiff alleges that the deprivation of his property interest was unauthorized by state law, the state need not provide predeprivation process but instead need only provide a postdeprivation remedy. Assuming, *arguendo*, that the increased cost of redemption did constitute a deprivation, the amended statute which provides for notice—and under which Equitable did indeed receive notice—provided a postdeprivation remedy of which Equitable did not avail itself. Thus, plaintiff's challenge to the sheriff's sale has been effectively dealt with by the state legislature in its amended statutory provisions.

1997 WL 876738, at * 5 (citations omitted).

Similarly, American seeks predeprivation process when it had full post-deprivation remedies available to it. American asks this court to alter the system devised by the Texas Legislature and to substitute instead the right to litigate another party's due process violations by collateral attack on the tax sale judgment. To do so would not only reward American for sleeping on its rights but also encourage similar behavior by others who would follow American's lead in the conduct of their business affairs in the future. Principles of comity weigh against permitting the assignment of SF3's due-process claim to American under these circumstances.[21]

---

[21]We note that the Fifth Circuit, in *In re Paxton*, 440 F.3d 233, 236 (5th Cir. 2006), stated that it found no reversible error when a bankruptcy court and then a district court found that a mortgage-interest assignee could pursue its assignor's

### 3. Conclusion

Regardless of whether SF3 was named and served with citation in the tax suit, American was provided ample notice and opportunity to challenge the validity of Pirkle's deed in compliance with the statutory scheme designed for just this situation. Instead, American, aware of the tax code and its provisions (having cited portions of the code to Pirkle in its January 15 letter), simply chose to ignore its statutory remedies. Applying long-standing notions of equity and public policy, as set forth above, we hold that American has no standing to assert SF3's due-process violations under the circumstances presented in this case.[22] We overrule this part of American's first issue, and in light of our disposition here, we hold that American's purported lien was not enforceable against Pirkle. Therefore, the trial court did not err by denying American's motion for summary judgment on its cause of action for judicial foreclosure.

---

due process claims. However, the court did not elaborate on how the lower courts reached this conclusion or the underlying rationale beyond the district court's finding that "a valid assignment confers upon the assignee standing to sue in place of the assignor," and the lower courts apparently did not publish opinions to explain their reasoning. *Id.* And the court did not explain whether the lower courts reached this conclusion under federal law or Louisiana law or address whether there were other statutory remedies to address pre-deprivation process or any post deprivation remedies available to the parties involved. *Id.* Therefore, we do not consider *Paxton* to determine the outcome of this appeal.

[22]This holding should not inhibit assignments of liens in the future. Rather, assignees are simply encouraged to exercise the due diligence that is expected of any party involved in a real-estate transaction, i.e., to consult the deed records prior to acquiring an interest in property.

## B. Unconstitutional Taking Claim and Plea to the Jurisdiction

In its second issue, American complains that the taxing authorities are liable under its takings cause of action, a claim that American contends was timely asserted, and that the trial court erred by granting the taxing authorities' plea to the jurisdiction.

In its third-party petition against the taxing authorities,[23] American asserted its takings claim based on three grounds:  "(1) the taxing authorities performed an intentional act that proximately caused the extinction of Appellant's interest in the Property; (2) Appellant did not consent to the action; and (3) Appellant did not receive adequate compensation for the taking."  The taxing authorities responded that American had no standing to assert the claims, that the claims were time-barred, and that the taxing authorities were immune from suit.

Section 2007.021 of the government code, the Private Real Property Rights Preservation Act (PRPRPA) provides,

> (a) A private real property owner may bring suit under this subchapter to determine whether the governmental action of a political subdivision results in a taking under this chapter.  A suit under this subchapter must be filed in a district court in the county in which the private real property owner's affected property is located . . . .

---

[23]The trial court had already ruled on American's and Pirkle's summary judgment motions and declined American's motion for reconsideration when American filed its third-party petition on March 7, 2014—more than a year after American acquired its interest in the property and sent its first letter to Pirkle regarding the tax sale.

(b)  A suit under this subchapter must be filed *not later than the 180th day after the date the private real property owner knew or should have known that the governmental action restricted or limited the owner's right in the private real property*.

Tex. Gov't Code Ann. § 2007.021 (West 2008) (emphasis added).

Assuming, without deciding, that American had standing to bring suit against the taxing authorities,[24] pursuant to PRPRPA, American was required to bring suit within 180 days of the date it knew or should have known that its rights in the property had been restricted or limited.  *See id.*  Setting aside the question of whether on October 31, 2012—the date American received its assignment from SF3—American *should have known* about the tax sale and constable's deed (which had been filed of record more than two months earlier), certainly the record establishes that as of January 15, 2013—the date American sent its letter to Pirkle—American *actually knew* that the tax sale had occurred.  Therefore, pursuant to section 2007.021(b), the very latest date on which American could have filed its takings claim was July 15, 2013—180 days after January 15, 2013.  American filed its third-party petition on March 7, 2014.

American does not dispute that its takings claim was subject to PRPRPA's 180-day limitations period, but it argues that its claim was nevertheless timely

---

[24]The PRPRPA defines an "owner" as "a person with legal or equitable title to affected private real property *at the time a taking occurs*," and "private real property" as "an interest in real property recognized by common law . . . that is not owned by the federal government, this state, or a political subdivision of this state."  Tex. Gov't Code Ann. § 2007.002(2), (4) (West 2008) (emphasis added).

because the claim was not "ripe" until the trial court ruled on the summary judgment motions, declaring that the tax sale extinguished American's rights in the property under the deed of trust.[25]

To support this contention, American relies heavily upon *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, a zoning-ordinance case in which the Supreme Court held that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." 473 U.S. 172, 186, 105 S. Ct. 3108, 3116 (1985). American argues that since the trial court fits the general description of a government entity "with the authority to interpret and adjudicate the proper applications of statu[t]es and regulations," its takings claim was not ripe for filing until the trial court entered its partial summary judgment on September 30, 2013, which "divested [American] of its rights in the [p]roperty."

This argument wholly ignores the prior judgment issued by the same trial court more than a year earlier, on April 26, 2012, which granted the authority to conduct the tax sale. Once the tax sale occurred pursuant the authority of the court, tax code section 34.08 established that Pirkle took "free and clear title,"

---

[25]American argues that "[b]ecause [American] filed its Third Party Petition 158 days later, on March 7, 2014, the [t]axing [a]uthorities' argument, that [American] asserted its claim outside the 180-day statutory period, must necessarily fail."

40

subject only to timely challenge pursuant to other Texas Tax Code provisions. At the very latest, as soon as SF3 or American knew about the court-authorized tax sale, it also knew that governmental action had been taken which "restricted or limited" its right in property. *See* Tex. Gov't Code Ann. § 2007.021.

Furthermore, the facts of this case are quite different from circumstances where a party is awaiting a final decision from a zoning commission or other regulatory agency to determine whether the ultimate decision will be adverse to its property interest. *Cf. Williamson Cnty.*, 473 U.S. at 186, 105 S. Ct. at 3116 (stating that a takings claim is ripe when a final decision on the application of zoning ordinance and subdivision regulations to the property is obtained and state procedures have been used for obtaining just compensation). In fact, the PRPRPA recognizes this distinction by providing two methods through which a property owner may assert a takings claim under PRPRPA: (1) a section 2007.021 "suit . . . to determine whether the governmental action . . . results in a taking" or (2) a section 2007.022 "contested case with a state agency to determine whether a governmental action of the state agency results in a taking."[26] Tex. Gov't Code Ann. §§ 2007.021–.022 (West 2008); *BP Am. Prod. Co.*, 290 S.W.3d at 366 (holding that the former must be brought in district court

---

[26]If a property owner asserts a takings claim by filing a contested case with a state agency, it must exhaust all administrative remedies available within that agency and be "aggrieved by a final decision" in the contested case to be entitled to judicial review. *State v. BP Am. Prod. Co.*, 290 S.W.3d 345, 366 (Tex. App.— Austin 2009, pet denied); *see also* Tex. Gov't Code Ann. § 2007.025(b) (West 2008).

41

in the county where the property is located and the latter is filed with the state agency whose "governmental action" is alleged to have constituted a taking, but "[in] each case, the proceeding must be filed with its appropriate tribunal 'not later than the 180th day after the date the . . . owner knew or should have known that the governmental action restricted or limited the owner's right in the private real property'") (quoting Tex. Gov't Code Ann. §§ 2007.021(b), .022(b)).

Beginning on the date when American "knew or should have known" about the tax sale and constable's deed—whether October 31, 2012 or January 15, 2013—American possessed all facts necessary to determine whether a takings claim should be filed against the taxing authorities. *See Hidalgo Cnty. v. Dyer*, 358 S.W.3d 698, 707 (Tex. App.—Corpus Christi 2011, no pet.) (rejecting argument that takings claim was tolled pending a ruling by the trial court in condemnation suit and holding that nothing in PRPRPA's plain language provides for tolling the time a private property owner may bring suit: "Under the statute, the time to file suit depends only on when the property owner knew or should have known of the restriction or limitation on the owner's real-property right. It does not depend on the timing of any other factor."). By its own admission,[27] when the taxing authorities failed to name SF3 as a party to the

_____

[27]In its brief, American complains,

Perhaps most troubling is the inescapable conclusion that the [t]axing [a]uthorities knowingly violated state law when they filed the [t]ax [s]uit. As stated in [American's] Third Party Petition, "SF3, the current lienholder of record and a party needed for just adjudication

42

underlying delinquent-tax suit, the taxing authorities had taken action that either "caused" the taking or that was "substantially certain to result in the complained-of taking." We overrule American's second issue without reaching the remainder of its arguments. *See* Tex. R. App. P. 47.1.

## C. Attorney's Fees

In its final issue, American argues that the trial court erred by awarding attorney's fees to Pirkle, contending that Pirkle's counsel failed to segregate her fees between the various parties and the causes of action asserted at the August 14, 2014 hearing on American's motion for entry of final judgment. However, a reporter's record of the August 14, 2014 hearing was not made.[28] Without a reporter's record of the hearing, we cannot determine whether American objected to the alleged failure to segregate. *See* Tex. R. App. P. 33.1; *Green Int'l, Inc. v.*

---

of the matter, was not named as a defendant in the [t]ax [s]uit by any of the [t]axing [a]uthorities and was not provided any notice of the [t]ax [s]uit proceedings."

. . . .

By ignoring the statutorily mandated requirements for instituting the [t]ax [s]uit, specifically by failing to identify and join the lienholder of record in the [t]ax [s]uit, the [t]axing [a]uthorities took action that *caused the taking or that was substantially certain to result in the complained-of taking.*" [Emphasis added.]

[28]The clerk of this court has contacted the trial court clerk to determine whether the hearing was recorded, and the trial court clerk has indicated that no such record was made or filed. The clerk's record contains only American's letter designating the contents of the clerk's record and does not contain a request by American for the reporter's record or a designation of the portions that it should contain. *See* Tex. R. App. P. 34.5(a)(9), 34.6(b).

43

*Solis*, 951 S.W.2d 384, 389 (Tex. 1997); *see also Fire Ins. Exch. v. Kennedy*, No. 02-11-00437-CV, 2013 WL 441088, at *5 (Tex. App.—Fort Worth Jan. 31, 2013, pet. denied) (mem. op.).[29]  We overrule American's final issue.

## V.  Conclusion

Having sustained the part of American's first issue pertaining to the declaration on Lewis's note, we modify the trial court's judgment to delete this declaration.  Having overruled the remainder of American's dispositive issues, we affirm the trial court's judgment as modified.


/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL:  DAUPHINOT, GABRIEL, and SUDDERTH, JJ.

DAUPHINOT and GABRIEL, JJ., concur without opinion.

DELIVERED:  September 3, 2015

---

[29]The clerk's record does not reflect that American filed any post-judgment motions to attempt to preserve this complaint.  *Compare Goldman v. Olmstead*, 414 S.W.3d 346, 368 n.6 (Tex. App.—Dallas 2013, pet. denied) (concluding that complaint about failure to segregate fees was preserved in post-trial brief submitted before rendition of judgment), *with Lawson v. Keene*, No. 03-13-00498-CV, 2015 WL 4071561, at *5 (Tex. App.—Austin July 1, 2015, no pet. h.) (mem. op.) (requiring segregation to be raised in a bench trial and holding that raising segregation for the first time in a motion for new trial does not preserve error).

44